Jane Doe
5424 Sunol Blvd, Suite 10-475
Pleasanton, CA 94566
510-679-1288
janedoevhpd@gmail.com
In Propria Persona

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

(San Francisco)

| | |
|---|---|
| JANE DOE<br>　　　　　　Plaintiff,<br>　　　v.<br><br>CITY OF HAYWARD, a municipal corporation; HAYWARD POLICE DEPARTMENT; TONY CHAPLIN, individually and in his capacity as Chief of Police for the City of Hayward; DANIEL MORGAN, individually and in his capacity as a police officer for the City of Hayward; ALEX IWANICKI, individually and in his capacity as a police officer for the City of Hayward; SGT ZACHARY HOYER, individually and in his capacity as a police supervisor for the City of Hayward; SGT FAYE MALONEY, individually and in her capacity as a police supervisor for the City of Hayward, ROES 1 to 50, inclusive,<br><br>　　　　　　Defendants. | Case No: 3:23-cv-05007-SK<br><br>**OPPOSITION TO MOTION TO DISMISS**<br><br>Date: January 25, 2024 at 8:00 A.M<br>Location: to Courtroom 12 – 19th Floor (SF)<br>Judge: Honorable William Alsup |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

Plaintiff Jane Doe opposes the Motion to Dismiss of Defendants in the case Jane Doe v. City of Hayward et al. This Opposition is based upon Plaintiff's Complaint—which sufficiently alleges causes of action and/or a claim for relief against Defendant and sufficiently apprises Defendant of the nature of the claims asserted therein within the appropriate limitation periods—Plaintiff Jane Doe's Declaration with Exhibits, and oral argument at hearing .

TABLE OF CONTENTS

I.    Issues to be Decided ......................................................... 2
II.   Memorandum of Points and Authorities ............................ 2
III.  Argument ......................................................................... 7
IV.   Causes of Action ..............................................................14
V.    Conclusion ...................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Auster Oil & Gas, Inc. v. Stream*
(1985) 764 F.2d 381, 386 (5th Cir) ……………………………… 7

*Board of Comm'rs v. Brown*
(1997) 520 U.S. 397, 410 ……………………………………… 18

*California Motor Transp. Co. v. Trucking Unlimited*
(1972) 404 U.S. 508, 92 S. Ct. 609, 30 L. Ed. 2d 642 ……… 10

*City of Canton, Ohio v. Harris*
(1989) 489 U.S. 378, 109 S. Ct, 103 L. Ed. 2d …………….. 17

*City of Tahlequah, Oklahoma v. Bond,*
(2021) 595 U.S. 9, S. Ct. 9, 211 L. Ed. 2d ………………….. 14

*Cnty. of Sacramento v. Lewis*
(1998) 523 U.S. 833, 118 S. Ct., 140 L. Ed. 2d 1043 ……….. 8

*Comcast Corp. v. National Assn. of African American-Owned Media*
(2020) 140 S.Ct. 1009, 1019 …………………………………… 20

*Conley v. Gibson*
(1957) 355 U.S. 41, 45-46 …………………………………….. 7

*Connick v. Thompson*
(2011) 563 U.S. 51, 61 ………………………………………… 18

*Cornell v City & County of San Francisco*
(2018) 17 CA 5th 766 ………………………………………….. 19,20

*Fed. Mar. Bd. v. Isbrandtsen Co.*
(1958) 356 U.S. 481, 514 …………………………………….. 13

*Flores v. Pierce*
(1980) 617 F.2d 1386, 1389 (9th Cir) ……………………….. 12,13

*Gable v. Lewis*
(2000) 201 F.3d 769 (6th Cir) ……………………………….. 10,11,12

*Gilligan v. Jamco Dev. Corp.*
(1997) 108 F.3d 246, 249 (9th Cir) ………………………….. 7

*Ileto v. Glock, Inc.*
(2003) 349 F.3d 1191, 1200 (9th Cir) ……………………….. 7

*Jackson v. Birmingham Bd. of Educ.*
(2005) 544 U.S. 167, 125 S. Ct, 161 L. Ed. 2d …………….. 11,13

*Jackson v. New York State*
(2005) 381 F. Supp. 2d 80 (N.D.N.Y) ……………………….. 12

*Keates v. Koile*
(2018) (9th Cir) 883 F.3d ……………………………………… 16

*Monell. Thompson v. City of Los Angeles*
(1988) 885 F.2d 1439, 1443-44 (9th Cir) ……………………. 16

*Monell v. Dep't of Soc. Servs. of City of New York*
(1978) 436 U.S. 98 S. Ct, 56 L. Ed. 2d ……………………… 18

*Oklahoma City v. Tuttle*
(1985) 471 U.S. 808, 823-24 …………………………………. 16

*People v Flores*
(2007) 157 CA4th 216, 221 …………………………………… 12,13

*People v Kimble*
    (1988) 44 C3d 480, 498 ……………………………………… 13
*Reese v. County of Sacramento*
    (2018) 888 F.3d 1030, 1043 (9th Cir) ………………………… 19
*Rosenbaum v. City and Cnty of San Francisco*
    (2007) 484 F.3d 1142, 1152 (9th Cir.) ……………………… 11,16
*Rossi v. City of Chicago*
    (2015) 790 F.3d 729 (7th Cir.) ……………………………… 9,15,21
*Smith v. Arkansas State Highway Employees, Local 1315*
    (1979) 441 U.S. 463, 464-65 ………………………………… 10
*Starbucks Corp. v. Superior Court*
    (2008) 168 Cal. App. 4th) 436,) 452 ………………………… 6
*Sullivan v. Little Hunting Park, Inc.*
    (1969) 396 U.S. 229, 237 …………………………………… 10
*United States v. Hylton*
    (1983) 710 F.2d 1106 (5th Cir.) …………………………… 9

**Statutes**
42 U.S. Code § 1981 …………………………………………… 3
42 U.S. Code § 1983 …………………………………………… 3
42 U.S. Code § 1985 …………………………………………… 3
Cal. Civ. Code § 52.1 …………………………………………… 3,19
26 U.S.C.A. § 7212(a) ………………………………………… 9
U.S.C.A. Const.Amend. 1 ……………………………………... 9,10
U.S. Const. Amend. 4 ………………………………………… 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   ISSUES TO BE DECIDED

Does Plaintiff state a viable claim upon which relief can be granted? Yes, Plaintiff adequately states numerous viable claims and therefore, the Motion to Dismiss should be overruled in its entirety. If the Court is inclined to dismiss, Plaintiff requests leave to amend to address any deficiencies in her complaint. Plaintiff would like to add a cause of action based on the Fifth Amendment as well as defamation per quod and factual allegations and other details as the information becomes available.

## II.   MEMORANDUM OF POINTS AND AUTHORITIES

### A.  Introduction and Factual Allegations

As background, Plaintiff became a victim of serial crime following her objection to sexual harassment and stalking at the University of California, as determined by experts in Declarations. [These expert reports from two private investigator firms and PhD statisticians (for example, see Exhibit A to Jane Doe's Declaration in Support of Opposition to Motion to Dismiss ("Opposition") for a true and accurate copy of a report from Bardwell Consulting, indicating that the crime pattern to which Plaintiff and her family were subjected is targeted and not random) were provided prior to Hayward PD, determining that Plaintiff is a victim of serial crime.]

As determined by (additional, separate) expert Professor Phyllis Gerstenfeld, PhD in Psychology and JD, Plaintiff is a victim of "hate crime" and of "terrorism" (See Exhibit B of Jane Doe's Declaration in Support of Opposition for a true and accurate copy of this expert report (pages 4-7),  demonstrating that Plaintiff is reliable and credible victim of major crime, also provided in person and electronically to Hayward PD including but not limited to Sergeant Clayton, Sergeant Irizarri, Seargeant Hoyer, Officer Morgan, and Chief Chaplin in or about May 2022 and afterward). Plaintiff has also made multiple reports of crime to the Hayward PD from 2014 onward.

Defendants therefore had knowledge that Plaintiff has been determined by qualified, third party experts to be a victim of serial crime, of hate crime and of terrorism. Defendants had prior knowledge of Plaintiff's prior filed credible police reports with substantial evidence.

Plaintiff came to the Hayward PD lobby on May 27, 2022 to file a police report regarding sexual assault/battery and hate crime at approximately 11:45am. Thereafter, Defendants subjected Plaintiff to multiple tortious acts and other misconduct, for which Plaintiff pursues the following causes of action: 42 U.S. Code § 1983 First, Fourth, & Fourteenth Amendments, Monell Claim; 42 U.S. Code § 1985 Conspiracy to Violate Rights; 42 U.S. Code § 1981; Cal. Civ. Code § 52.1; Retaliation; Defamation; Defamation Per Se; Invasion of Privacy; Negligence; Negligence Per Se; Negligent Infliction of Emotional Distress; Intentional Infliction of Emotional Distress.

At the police department, Plaintiff provided Defendants with two different expert reports (from Dr. Liu, former Professor of Electrical Engineering at Northwestern University, and from AAA Security firm comprised of engineers specializing in electronic computational assessment of samples for electronic/semi-conductor technology) evaluating the type of foreign object(s) extracted from Plaintiff's body (her intimate parts) and identifying the foreign object(s) as electronic device/semi-conductor technology. [Plaintiff proffers true and accurate copies of these expert reports per the Court's preference or instruction.]

By petitioning and seeking redress from the government, Plaintiff was engaged in a constitutionally protected activity. On May 27, 2022, Defendants made false statements on a police report a) that Plaintiff was an informant (which is false but puts Plaintiff at risk in a police report, as "snitches" are disfavored and understood to have made some deal after having been caught in a crime) b) that she was suspicious and c) that she suffered from a serious mental illness; harassed her by forcing her to wait standing to the point of exhaustion; threatened and

intimidated Plaintiff by surrounding her in her vehicle and threatening her with a 5150 without cause; omitting pivotal expert reports and other information from the police report; violating Department policies about honesty and accurate documentation; misrepresenting her husband's testimony, questioning Plaintiff's husband with bias, and trying to manipulate Plaintiff's husband into saying something was wrong with Plaintiff (when her husband stated otherwise); treated Plaintiff disparagingly and subjected her to humiliation and anxiety; Defendants Morgan, and Supervisor Sgt Hoyer refused to end their tortious course of conduct. Sgt Hoyer and Officer Iwanicki did not intervene to prevent multiple acts of misconduct.

Notably, Officer Morgan fabricated and published false information in his police report that Plaintiff had a severe mental illness and attributed this negative characterization to a mental health worker. An independent investigation by Alameda County's division of mental health revealed that no such statement had been made by this mental health worker; therefore, the Officer Morgan fabricated information and made a false statement in order to discredit Plaintiff. Officer Morgan and Sgt Hoyer also refused to link this police report to the many others filed by Plaintiff, which is inconsistent with their linked police reports (for stalking cases) policy.

Officer Morgan's colleagues failed to intervene and his supervisors including Internal Affairs Bureau ("IAB") Sgt Maloney and Chief of Police Chaplin approved of this tortious conduct when it was brought to their notice. Hayward PD supervisors were subsequently put on notice when Plaintiff complained to the Department's Internal Affairs Bureau (IAB) on November 27, 2022. As detailed in her IAB complaint provided to Defendants, officers also violated the following policies from the Hayward PD Policy Manual (2021): Hayward PD Mission Statement, 324.3.5(c) unsatisfactory work performance, 324.3.5(f) wrongful exercise of authority, 324.3.5(i) falsification of work-related records, 324.3.5(m) knowing or negligent violation of Department manual provisions, 324.3.5(p) omission or misrepresentation of material

information in any police report, 324.3.5(q) failure to take reasonable action, 324.3.5(z) violating any misdemeanor or felony statute, 324.3.5(ab) failure of employee to properly perform, 324.3.5(ae) police honesty, and p.283 reports are detailed and free from error. Finally, officers violated CA Penal Code 118.1 (knowingly making false statement in report).

Subsequently, Plaintiff emailed Sgt Maloney at least twice about her allegations (January 4, and February 14, 2023) as well as Chief Chaplin on at least three occasions (December 26, 2022, January 3, February 14, 2023). Chief Chaplin and Sgt Maloney, once put on notice about the problem Hayward PD had created for Plaintiff, refused to take remedial action with training or other action including but not limited to refusing to correct the false statements, refusing to include pivotal information that had been omitted from the police report as requested, and/or follow the Department's policy of disciplining officers who make false statements[1] (e.g., a serious offense -342.5 (ae) An officer found to have lied intentionally in any official document…shall be terminated). (Hayward PD Policy Manual 2021.)  That is, Defendants created a police report with false and defamatory statements, knowing that the report was highly discrediting, and they refused to correct the false information, even and in spite of multiple requests by Plaintiff with information that contradicts the false information. Defendant supervisors treated Plaintiff with bias and never contacted Plaintiff to interview her nor to request additional information from her after the IAB complaint, simply "determining" that it was unfounded.

Defendants promulgated and/or failed to promulgate policies and procedures regarding the unlawful conduct and failed to discipline officers complained of, demonstrating an entrenched culture, policy and/or practice of promoting, tolerating and/or ratifying unlawful conduct with deliberate indifference. Defendants were deliberately indifferent toward training or supervision.

Plaintiff's constitutionally protected activity was a substantial or motivating factor for Defendants' acts; Defendants' acts would likely have deterred a reasonable person seeking redress from the government; and Plaintiff was harmed as a result of Defendant's conduct. Plaintiff suffered severe emotional distress. Plaintiff was also silenced and has not filed a police report since May 27, 2022. As a serial crime victim, Plaintiff must maintain her credibility in order to make further police reports. Hayward PD attempted to discredit Plaintiff. Therefore, Plaintiff was at risk of further biased treatment for anyone (include police officers) who accessed the police report, a public document subject to open records laws and subpoenas, for which Defendants subsequently received requests for Plaintiff's records by third parties, increasing Plaintiff's anxiety.

As a victim of sexual battery/assault/abuse Plaintiff filed her complaint in Alameda County Superior Court on July 6, 2023 under the pseudonym "Jane Doe" to safeguard her privacy and safety. Filing pleadings with pseudonyms is common in cases with victims of sexual misconduct or abuse (Starbucks Corp. v. Superior Court (2008) 168 Cal. App. 4th) 436,) 452.).

On or about September 29, 2023, Defendants filed a Notice of Removal, initiating case transfer to United States District Court of Northern California. The district court required Plaintiff to "file a motion to proceed anonymously" and to request e-filing permission from the courtroom deputies (Plaintiff has complied but is still waiting for permission to e-file).

Defendants filed a Motion to Dismiss on October 6, 2023.

Plaintiff has received medical treatment due to pain and suffering and severe emotion distress caused by Defendants' action. Plaintiff is an eggshell plaintiff.

Plaintiff is a crime victim and university professor who must maintain her credibility in order to report future events and in order to do her job. Defendants' misconduct oppressed Plaintiff,

silencing her with their biased, threatening, intimidating acts such that she has not filed a police report since.

Is this how the Hayward PD should treat Asian American women who are known crime victims and who step forward to report sexual assault/harassment/discrimination in an era of anti-Asian hate crimes? In fact, the Hayward PD's policy and behavior are oppressive and shocking to the conscience.

On October 18, 2023, Plaintiff filed her Motion for Leave to Proceed Under Pseudonym.

On October 20, 2023, Parties filed a joint stipulation to extend the deadline for Plaintiff's Opposition to Motion to Dismiss until October 30, 2023.

On October 30, Plaintiff filed her Opposition to Motion to Dismiss, respectfully requesting that the Court overrule the Motion to Dismiss in its entirety. If the Court is inclined to dismiss, Plaintiff requests leave to amend.

## III. ARGUMENT

### i. Motions to Dismiss Are Disfavored.

The Defendants' Motion to Dismiss should be denied because it omits and misrepresents important information and legal argument, which when considered properly, lead to the conclusion that Plaintiff's causes of action as pled are sufficient.

Motions to dismiss are disfavored given "'a powerful presumption against rejecting pleadings for failure to state a claim.'" Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997) (quoting Auster Oil & Gas, Inc. v. Stream, 764 F.2d 381, 386 (5th Cir. 1985)). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). A district court must take as true all well-pleaded

allegations of material fact. The court must construe them in the light most favorable to the plaintiff when considering a motion to dismiss. Ileto v. Glock, Inc., 349 F.3d 1191, 1200 (9th Cir. 2003). All inferences supporting the complaint that a trier of fact could draw reasonably from the evidence must be taken into account. See id.

### ii. Defendants' behavior shocks the conscience.

Defendants claim that Plaintiff's allegations of police misconduct do not shock the contemporary conscience; however, Plaintiff contends factual allegations that indeed shock the conscience given treatment for of an innocent and known crime victim who is reporting sexual assault/battery.  The distinguishing factor for law enforcement behavior that shocks the conscience pivots on intent to harm or to worsen the plight of victims with no legitimate government interest. This is the case for how Defendants treated Plaintiff.

"Deliberate indifference [standard] demands exact analysis of circumstances before any abuse of power is condemned as conscience-shocking... Conduct deliberately intended to injure in some way is unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Whether that level is reached when culpability falls between negligence and intentional conduct is a matter for closer calls.  Cnty. of Sacramento v. Lewis, 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998).

"In the circumstances of a high-speed chase aimed at apprehending a suspected offender, where unforeseen circumstances demand an instant judgment on the part of an officer who feels the pulls of competing obligations, only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the shocks-the-conscience test….Smith was faced with a course of lawless behavior for which the police were not to blame…. Willard's outrageous behavior was practically instantaneous, and so was Smith's instinctive response. There is no reason to believe that they were tainted by an improper or malicious motive. Pp. 1716–1721." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 834–35, 118 S. Ct. 1708, 1711, 140 L. Ed. 2d 1043 (1998)

In contrast, for Plaintiff's case, Defendants had the opportunity to pause, reflect, and strategize prior to meeting with her after she contacted dispatch to make a report, during her initial report with Officers Morgan and Iwanicki and Sgt Hoyer and after the date of the incident

when she complained to the Internal Affairs Bureau and followed up with that staff as well as the Chief of the Hayward Police Department, each of these comprising multiple opportunities to decide NOT to violate Plaintiff's rights, alter their behavior toward Plaintiff, and to act in accordance with the law. <u>Unlike CHP officers chasing Willard, Defendants in the instant case were not in a high-pressure situation demanding instantaneous decisions.</u> Unlike Willard in *Cnty. of Sacramento v. Lewis*, Plaintiff in the instant case was not engaged in any illegal activity and did nothing to provoke Hayward PD officers. Instead, Defendants chose to treat Plaintiff with bias after repeat deliberation and with no legitimate government interest.

Defendants in the instant case made numerous false statements, false allegations, and misrepresentations in order to discredit Plaintiff. Accuracy of reports of government agents is important to determine whether Defendants' conduct was deceptive, frivolous or fraudulent or factually accurate. 26 U.S.C.A. § 7212(a); U.S.C.A. Const.Amend. 1." <u>United States v. Hylton</u>, 710 F.2d 1106 (5th Cir. 1983). In *Hylton*, even though government agents questionably took action to impede other agents by filing complaints against them, these were factually accurate and therefore not fraudulent. In contrast, Defendants in the instant case misrepresented and made false statements and retaliated otherwise for no legitimate purposes.

### iii. Defendants violated Plaintiff's constitutional & federal rights including (e.g., First and Fourteenth Amendment Rights)

"The First and Fourteenth Amendments protect the rights of individuals to seek legal redress for claims that have a reasonable basis in law and fact. U.S.C.A. Const.Amends. 1, 14." <u>Rossi v. City of Chicago</u>, 790 F.3d 729 (7th Cir. 2015)

#### *First Amendment*

Defendants claim that they did not interfere with Plaintiff's right to seek redress from the government. They claim: "Even if the Right to Petition was at issue, the Complaint does not sufficiently allege a First Amendment violation, especially because Officers did not interfere with Plaintiff's right to file her police report or present any evidence or documentation that supported her allegations (Complaint at ¶¶ 24-27). Rather, Plaintiff was afforded the opportunity, without "threats, intimidation or coercion," to report what had occurred, including providing

corroboration from her husband and presenting "multiple expert reports indicating key facts" (¶¶ 30-34)." (Motion to Dismiss, page 4 at lines 1-7).

Plaintiff's report of victimization regarding sexual assault, hate crime and terrorism to Hayward PD qualifies as First Amendment protected activity. "Submission of complaints and criticisms to nonlegislative and nonjudicial public agencies like a police department constitutes petitioning activity protected by the First Amendment's petition clause. U.S.C.A. Const.Amend. 1." Gable v. Lewis, 201 F.3d 769 (6th Cir. 2000). "The right to petition extends to all departments of government" California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972).

Defendants retaliated against Plaintiff for her First Amendment protected activity; therefore, they violated her First Amendment right to free speech and her Fourteenth Amendment right to due process. Plaintiff reported violations/discrimination due to her status as an Asian American woman and then was retaliated against by Hayward PD due to that reporting. Defendant actions to discredit and harm Plaintiff after her reporting to police were retaliatory, and that is illegal. "Courts, including the Supreme Court, have held that various anti-discrimination statutes contain an implied cause of action for retaliation based on the general prohibition against intentional discrimination…A statute that prohibits intentional discrimination implicitly prohibits acts of retaliation for complaints about or opposition to discrimination. See Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237 (1969) (a prohibition on racial discrimination includes an implicit prohibition on retaliation against those who oppose the discrimination).

The First Amendment provides that Congress shall make no law abridging the right of the people "to petition the Government for redress of grievances."  However, the Petition Clause guarantees only that an individual may "speak freely and petition openly" and that he will be free from retaliation by the government for doing so." Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 464-65 (1979) (per curiam). "We recognize that government retaliation for filing a petition violates the literal language of the Petition Clause which forbids "abridging ... the right of the people ... to petition the government for a redress of grievances." Most cases can be imagined to be "tantamount" or "analogous" to some other case. We should

not split hairs when the conduct literally violates the language of the Petition Clause and when the Supreme Court seems to be clear on the subject." <u>Gable v. Lewis</u>, 201 F.3d 769, 772 (6th Cir. 2000)

### *Fourteenth Amendment*

Defendants cite to *Rosenbaum* on enforcement of city ordinances -- "To prevail on its claim under the equal protection clause of the Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose" *Rosenbaum v. City and Cnty*, 484 F.3d 1142, 1152 (9th Cir. 2007) – as support for requiring both discriminatory effect and discriminatory purpose. Of course, enforcement of a city ordinance is very different from violating Plaintiff's right to petition and due process as she petitions the government, so the two-prong test and in particular, the discriminatory effect prong may not apply as a requirement in the same way. Nevertheless, with regard to *discriminatory purpose*, retaliating against someone for making a complaint of sex discrimination IS sex discrimination. "Retaliation against a person because that person has complained of sex discrimination is a form of intentional sex discrimination...retaliation is, by definition, an intentional act, retaliation is a form of discrimination because the complainant is being subjected to differential treatment, and the discrimination is 'on the basis of sex' because it is an intentional response to the nature of the complaint, namely, an allegation of sex discrimination." <u>Jackson v. Birmingham Bd. of Educ.</u>, 544 U.S. 167, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005). With regard to *discriminatory effect*, Defendants treat Asian American women who report sexual assault/harassment/discrimination differently and in fact, worse than those who are similarly situated and do not identify as Asian American women.

### iv. Right to seek redress from government without retaliation is clearly established

Precedent prior established the right to petition government without retaliation in Plaintiff's circumstances. The following are two cases wherein civilian women reported crimes, sexual harassment and sexual discrimination to law enforcement and were retaliated against by law enforcement for their reports. Similarly, in the instant case, Plaintiff is a civilian and was retaliated against by Defendants for her reporting.

A male highway patrol official was not entitled to qualified immunity for a claim by a female operator that he retaliated against her for filing a complaint of sex discrimination, because protection of her First Amendment right to petition was clearly established at time of retaliatory conduct. U.S.C.A. Const.Amend." 1.Gable v. Lewis, 201 F.3d 769 (6th Cir. 2000). *Id.*

Furthermore, the *Gable Court* ruled: "For these reasons, we conclude that the law interpreting the petition clause protects the plaintiff in filing a complaint with the Ohio Highway Patrol claiming sex discrimination, and **this law was clearly established prior to the retaliatory conduct** found by the jury in the present case. Hence the doctrine of official immunity is inapplicable. *Id.* (My emphasis.)

In another instance wherein female victim Jackson made a police report for harassment and multiple crimes, police officers were held liable for attempting to discredit the victim who filed the police reports. Like Plaintiff in pro per in the instant case, Jackson in pro per reported wrongdoing to government officials and was subjected to retaliation by attempts to discredit and even retaliation against her family. "Jackson alleged that the aforesaid behavior was part of a large conspiracy to deprive plaintiff of her constitutional rights, and to cloak the alleged illegal conduct of the State Police, that all of the numerous defendants took part in for over 10 years. (Second Amended Complaint, p. 17, ¶ 48, p. 67, ¶ 75)." Jackson v. New York State, 381 F. Supp. 2d 80, 83 (N.D.N.Y. 2005)] "Plaintiff's claims [of retaliation] after requesting that state police officers enforce orders of protection she had obtained against her neighbors…sufficiently alleged requisite nexus to support her First Amendment retaliation suit against officers." *Id.*

v. **Defendants acted with discriminatory intent.**

Defendants claim that Plaintiff has no proof of discriminatory intent. "Such intent is satisfied by a showing that the defendants either intentionally discriminated or acted with deliberate indifference." *Flores,* 324 F.3d at 1135. Deliberate indifference may be found if a school official or administrator responds or fails to respond to known discrimination in a manner that is clearly unreasonable. *See Flores,* 324 F.3d at 1135." (*Mansourian v. Board of Regents of the University of California at Davis* (2010) 757 F.Supp.2d 1030, 1046.)

To recall, among other bad acts, Defendants published in a police report a retaliatory, false allegation that Plaintiff is severely mentally ill and wrongfully attributed the statement to a

mental health worker (to deceptively give the false statement credibility). In an independent investigation, the County determined that there was no evidence of any negative statement made by the mental health worker. **"A party's false statement may be admitted in a civil or criminal case not to prove the truth of the matter stated, but to show consciousness of guilt**, *e.g.,* when a defendant on being arrested tells a police officer an alibi that is later proved false, or that the defendant later denies at trial." (My emphasis.) (My emphasis.) See *People v Kimble* (1988) 44 C3d 480, 498; *People v Flores* (2007) 157 CA4th 216, 221. Jefferson's California Evidence Benchbook (4th ed. CJA-CEB 2023) §3.9. Therefore, Defendants' false statements disparaging Plaintiff demonstrate their biased and retaliatory state of mind toward Plaintiff.

Defendants indeed made not only pejorative statements but took multiple retaliatory action against Plaintiff (see pages 5-7 in Opposition). Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment." Gutierrez v. Wash. Dep't of Soc. & Health Servs.(E.D. Wash. Sept. 26, 2005). "The very concept of retaliation is that the retaliating party takes action against the party retaliated against after, and because of, some action of the latter." Fed. Mar. Bd. v. Isbrandtsen Co., 356 U.S. 481, 514 (1958). "It is a form of "discrimination" because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination "based on sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination."  Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005)

> "Retaliation is a deliberate action used to send a clear message that complaining is unwelcome and risky. It is employed to instill fear in others who might consider making a complaint in the future. Those with cause for complaining are frequently among the most vulnerable in an institution. Once they complain, they are labeled "troublemakers." Retaliation, and the fear of retaliation, becomes a potent weapon used to maintain the power structure within the institution.

Ivan E. Bodensteiner, The Risk of Complaining—Retaliation, 38 J.C. & U.L. 1, 1 (2011).

### vi. Qualified Immunity does not free Defendants from liability.

Defendants claim that they are entitled to qualified immunity. Qualified immunity--which shields police officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known—does not protect those who are incompetent or knowingly violate the law. <u>City of Tahlequah, Oklahoma v.</u>

Bond, 595 U.S. 9, 142 S. Ct. 9, 211 L. Ed. 2d 170 (2021).  Where the analysis "may depend on the jury's resolution of disputed facts and the inferences it draws therefrom," qualified immunity cannot be decided by court motions. *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002).

Qualified immunity is often supported in cases with high pressure-contexts demanding split-second decisions and immediate physical threats, which should be distinguished from Plaintiff's instant case. Police officers who killed a suspect (who raised a hammer behind his head and appeared as if he were about to throw the hammer or charge at the officers) did not violate any clearly established law; hence, the doctrine of qualified immunity shielded officers from liability in § 1983 action for allegedly violating Fourth Amendment rights. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983. City of Tahlequah, Oklahoma v. Bond, 595 U.S. 9, 142 S. Ct. 9, 211 L. Ed. 2d 170 (2021).

## IV.    CAUSES OF ACTION

### i.   *42 U.S.C. § 1983 Relief and Monell Claims are legally sufficient*

In this instant case, each named Defendant was acting under color of law and deprived Plaintiff of her First and Fourteenth Amendment rights, among other rights, and through their acts and omissions caused Plaintiff harm including but not limited to severe emotional distress as an eggshell plaintiff.[2] 42 U.S.C. § 1983 creates a private cause of action for liability of officials and local and state governments for violations of the US Constitution and laws. Monell claims are specific to allegations of liability against a public entity as the policymaker, employer, and supervisor. A plaintiff must demonstrate that a person acting under color of state law deprived them of a right, privilege, or immunity secured by the Constitution or by federal law for relief under § 1983. 42 U.S.C.A. § 1983." Rossi v. City of Chicago, 790 F.3d 729 (7th Cir. 2015). A government entity can be held liable under § 1983 when the execution of a government policy or

---

[2] Plaintiff claims that Defendant violated her civil rights in violation of 42 U.S.C. § 1983. To establish this claim, Plaintiff must prove all of the following:
1. That Defendant intentionally and/or recklessly engage in misconduct (please see pages 5-7 of Opposition)
2. That Defendant was acting or purporting to act in the performance of [his/her/nonbinary pronoun] official duties;
3. That Defendants' conduct violated Plaintiff's rights including but not limited to her Fourth Amendment and Fourteenth Amendment rights
4. That Plaintiff was harmed; and
5. That Defendant's wrongful acts were a substantial factor in causing Plaintiff's harm

custom injures a plaintiff. 42 U.S.C.A. § 1983. <u>Rossi v. City of Chicago</u>, 790 F.3d 729 (7th Cir. 2015)

Defendants omitted true facts of the crime committed against Plaintiff by excluding expert reports and through fabrication and false statements and defamation. First and Fourteenth Amendment right of court access underscores that interference by state agents who willfully conceal the true facts about a crime is actionable as a constitutional rights deprivation under § 1983. U.S.C.A. Const.Amends. 1, 14; 42 U.S.C.A. § 1983." <u>Rossi v. City of Chicago</u>, 790 F.3d 729 (7th Cir. 2015).

To elaborate, Defendants in the instant case treated Plaintiff with bias repeatedly. More than defaming her, Defendants conducted a biased investigation, in contrast to *Rossi* where Defendants were absolved from liability as they engaged in a proper investigation: "Any failure of police detective to investigate alleged assault of alleged victim by individuals, including an off-duty police officer, if proven, did not deny alleged victim constitutional right to judicial access under the First and Fourteenth Amendments, even if alleged victim's civil case against his alleged assailants would have been stronger if detective had performed prompt investigation; detective did not conceal any facts about incident that were not already known to alleged victim, proper investigation was conducted within months of alleged crime and before expiration of statute of limitations, alleged victim was able to use findings of investigations in his civil suit, and alleged victim was free to pursue legal redress against his alleged assailants at all times. U.S.C.A. Const.Amends. 1, 14." <u>Rossi v. City of Chicago</u>, 790 F.3d 729 (7th Cir. 2015). Plaintiff in the instant case was discredited by Hayward PD through their repeated efforts, and prevented from pursuing legal remedies that would have been available to her otherwise.

Defendants then compounded their misconduct by refusing to end their tortious conduct, as delineated above. Courts have "held that defendants can be liable for 'integral participation' even if the actions of each defendant do not 'rise to the level of a constitutional violation." (Keates v. Koile (9th Cir. 2018) 883 F.3d 1228, 1241.)

### *Monell Claim*

Defendants argue that <u>there are no facts identifying or describing an official City or HPD policy or custom of unconstitutional conduct</u>.   Plaintiff has already elaborate on Fourth Amendment

and Fourteenth Amendment violations.  See pages 3-7 of Opposition for elaboration on Hayward Police Department policy and state penal code violations.

 Plaintiff argues that Defendants' behavior satisfies all three prongs for municipal liability, although satisfying any of the three prongs is sufficient for a Monell Claim. "There are three ways to show a policy or custom of a municipality warranting municipal liability for a constitutional violation: (1) by showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." Rosenbaum v. City & Cnty. of San Francisco, 484 F.3d 1142 (9th Cir. 2007). Misconduct in the instant case was consistent across named Defendants including superivors and even the Chief of Police, all of whom approved of or ratified the abuses. See pages 5-7 of Opposition.

As Plaintiff elaborates, the practice or custom is not some "random acts or isolated events," which would be insufficient under *Monell*. *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1443-44 (9th Cir. 1988). As Plaintiff delineates, the misconduct complained of does not constitute a "single incident of unconstitutional activity," which would not be enough for liability under *Monell*, "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy. . . ." *Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985).

Defendants were made aware of harmful conduct and failed to provide remedial training. "In resolving issue of city's liability for failing to properly train police officers, focus must be on adequacy of training program in relation to tasks particular officers must perform; that particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on city, for officer's shortcomings may have resulted from factors other than faulty training program. 42 U.S.C.A. § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). The City should have documented and fair processes for investigation of complaints against officers that officers follow. Hayward PD does not appear to have sufficient documentation, proper procedures, training and/or remedial training for misconduct.

The City's failure to train comprises deliberate indifferences to the rights of persons with whom they come into contact including but not limited to Plaintiff on numerous occasions, therefore making them liable under § 1983. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* (cleaned up). Only then can such a shortcoming be properly through of as a city policy or custom that is actionable under § 1983." *Id.* (cleaned up).

Not only did Officer Morgan, Officer Iwanicki and Sgt Hoyer violate Plaintiff's rights on May 27, 2022. Defendants Morgan and Hoyer were contacted once again on May 27, June 1 and June 4, 2022 by Plaintiff to follow up on other duties including attaching a supplemental report and linking their police report to Plaintiff's stalking informational report, per Hayward Police Department policy. On November 27, 2022, Plaintiff notified police department supervisors and submitted a complaint to IAB several times (with no follow-up from the agency) about the aforementioned allegations. Plaintiff learned that Sgt Maloney was in charge of her complaint and had forwarded the information to the city attorney's office. The City of Hayward determined the complaint was unfounded with no follow-up or request for interview or information or any questions from the agency. Defendants were determined to discredit Plaintiff and treat her with bias. Defendants' were notified of crucial omitted information and refuse to correct the illegal acts or their consequences.

Therefore, these policymakers of the Hayward PD were on actual or constructive notice. "[A] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* (cleaned up). "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the deliberate indifference — necessary to trigger municipal liability." *Id.* (cleaned up). *Connick v. Thompson,* 563 U.S. 51, 61 (2011). "

Through Plaintiff's IAB complaint and follow-up notices, Sgt Maloney and Chief Chaplin were aware of the misconduct and were on actual and/or constructive notice regarding Plaintiff's pain and suffering. "'[D]eliberate indifference' is a stringent standard of fault,

requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Comm'rs v. Brown,* 520 U.S. 397, 410 (1997). " "The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.* at 61-62 (cleaned up).

Under *Monell*, "local governments, like every other § 1983 "person" [including individuals acting in their official capacities], **may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such custom has not received formal approval through the government's official decision-making channels**. Pp. 2035–2036." <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 659, 98 S. Ct. 2018, 2019, 56 L. Ed. 2d 611 (1978). (My emphasis.) Here, Defendants' custom is to discriminate, retaliate against and to discredit Asian American women who make claims about sexual assault/harassment/discrimination. Defendants engaged in this discriminatory conduct against Plaintiff on May 27, 2022 and then committed additional acts of discrimination on numerous occasions afterward, establishing that the aforementioned is indeed the custom of Defendants. See pages 5-7 of Opposition. Specifically, as demonstrated when Plaintiff spoke out (as an inconvenient Asian American woman) regarding her sexual assault/harassment/discrimination, the custom of the Hayward PD is to retaliate, to make false statements, to defame and to discredit and to approve of or ratify the aforementioned wrongful behavior.

### ii. *Cause of action for conspiracy to violate rights is legally sufficient.*

Defendants conspired to deprive plaintiff of her rights or privileges (beyond Fourth and Fourteenth Amendments) in violation of state laws and Hayward Police Department Policy 2021 (see pages 3-7 in Opposition).  Under, 42 U.S.C.A. § 1985 (West), "If two or more persons in any State or Territory conspire…for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws…in any case of conspiracy set forth in this section, if

one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." Here, a conspiracy can be inferred from the consistency of overt acts and biased treatment of Plaintiff. (See pages 3-7 of Opposition for unlawful Defendant acts.)

### iii.  Cause of Action for Bane Act Cal. Civ. Code § 52.1 Is Legally Sufficient

Contrary to Defendants' Motion to Dismiss (lines 1-16), Plaintiff's Bane Act claims are legally sufficient. As elaborated prior, Defendants violated Plaintiff's First Amendment and Fourteenth Amendment rights, and their multiple acts of misconduct including but not limited to false statements or defamation are evidence of their intent. As elaborated prior, Defendants retaliated against Plaintiff for seeking redress from the government for her complaint of sexual assault/harassment/discrimination as an Asian American woman.

"A plaintiff can prove the "threat, intimidation, or coercion" element of a Bane Act claim by showing the defendant violated a constitutional or statutory right with specific intent. Cornell v City & County of San Francisco, 17 CA5th at 803; Reese v County of Sacramento, 888 F3d at 1044 ("the specific intent requirement articulated in Cornell is consistent with the language of [the Bane Act], which requires interference with rights by 'threat, intimidation, or coercion,' words which connote an element of intent"). Specific intent requires a two-part showing. First, the plaintiff must show that the right at issue is "clearly delineated and plainly applicable under the circumstances of the case." Cornell v City & County of San Francisco, supra. Second, the plaintiff must show that the defendant committed "the act in question with the particular purpose of depriving the citizen victim of [the] enjoyment of the interests protected by the right." Cornell v City & County of San Francisco, supra. Also, Specific intent is defined as "reckless disregard

of constitutional or statutory prohibitions or guarantees." Thus, whether the defendant understood that the action was illegal is not a requirement; reckless disregard of the right at issue is all that is necessary. Cornell v City & County of San Francisco, 17 CA5th at 804.

### iv. Cause of action under 42 U.S.C.A. § 1981 is legally sufficient.

A § 1981 plaintiff must initially plead and ultimately prove that, but for race, she would not have suffered the loss of a legally protected right. 42 U.S.C.A. § 1981. Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 206 L. Ed. 2d 356 (2020) See prior discussion that but for her attempt to seek redress from the government as an Asian American woman who had been sexually assaulted/harassed/discriminated against, Plaintiff would not have been retaliated against. Plaintiff was discriminated against due to both her race and gender as an Asian American woman.

### v. Retaliation cause of action is legally sufficient.

Plaintiff claims that Defendants retaliated against her for exercising a constitutional right. To establish retaliation, Plaintiff must prove all of the following:

1. That she was engaged in a constitutionally protected activity, which the Court will determine after the jury decides certain facts; 2. That Defendants did not have probable cause for their conduct, which the Court will determine after jury decides certain facts: please see pages 3 to 7 of this Opposition for factual allegations; 3. Plaintiff's constitutionally protected activity was a substantial or motivating factor for Defendants' acts; 4. Defendants' acts would likely have deterred a reasonable person seeking redress from the government; and 5. Plaintiff was harmed as a result of Defendant's conduct. Plaintiff suffered severe emotional distress. Plaintiff was also silenced and has not filed a police report since May 27, 2022. As a serial crime victim, Plaintiff must maintain her credibility in order to make further police reports. Hayward PD attempted to discredit Plaintiff. Therefore, Plaintiff was at risk of further biased treatment for anyone who

accessed the police report, a public document subject to open records laws and subpoenas (and available to law enforcement in a database), for which Defendants subsequently received requests for Plaintiff's records by third parties, increasing Plaintiff's anxiety; 6. The law requires that the trial judge, rather than the jury, decide if Plaintiff has proven element 1 and element 2 above. The jury must decide whether Plaintiff has proven and resolved factual disputes.

### vi. Negligence and Negligence Per Se causes of action are legally sufficient.

Defendants were NOT just inactive. Mere inaction by law enforcement does not give rise to a constitutional claim for which the police can be held liable under § 1983. 42 U.S.C.A. § 1983." Rossi v. City of Chicago, 790 F.3d 729 (7th Cir. 2015). Assuming, inuendo, that Defendants called mental health services in order to provide [Plaintiff] with support, they initiated action (as opposed to refused to take any action) and therefore engaged in a special relationship with Plaintiff wherein they owed her a duty of care. They violated that duty of care when they defamed her and discredited her, among other acts causing her mental harm, and therefore, Defendants are liable for the causes of action for negligence and negligence per se.

### vii. Cause of action for invasion of privacy is legally sufficient

Plaintiff claims that Defendants violated her privacy by putting her in a false light. This fabricated information portrayed Plaintiff as severely mentally ill, as suspicious, as an informant (Plaintiff is none of these.) 1. Defendants publicly disclosed information or material that showed Plaintiff in a false light by publishing the information on a public police report that was then entered into law enforcement databased and subpoenaed by third parties; 2. That the false light created by the disclosure would be highly offensive to a reasonable person in Plaintiff's position; 3. That there is clear and convincing evidence Defendant knew the disclosure would create a false impression about Plaintiff or acted with reckless disregard for the truth; [or] 4. That Defendants were negligent in determining the truth of the information or whether a false

impression would be created by its disclosure; 5. That Plaintiff was harmed; and that Plaintiff sustained harm to her property, business, profession, or occupation including money spent as a result of the statement(s); and 5. That Defendants' conduct was a substantial factor in causing Plaintiff's harm. See pages 5-7 of Opposition.

viii. *Causes of action for Intentional Infliction of Emotional Distress, Defamation Per Se, and Defamation are Legally Sufficient.*

Intentional Infliction of Emotional Distress: Plaintiff claims that Defendants' intentional conduct caused her to suffer severe emotional distress. 1. Defendants' conduct was outrageous; 2. Defendants intended to cause Plaintiff emotional distress and/or Defendant acted with reckless disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was present when the conduct occurred; 3. Plaintiff suffered severe emotional distress; and 4. Defendants' conduct was a substantial factor in causing Plaintiff's severe emotional distress. See prior discussion of factual allegations, intent, and distress.

Defamation and Defamation Per Se: Plaintiff claims that Defendants harmed her by making the following statement, among other defamatory statements, that the "'Alameda County Mental Health Clinician' listened to [Plaintiff] and later made his assessment as 'delusional behavior,, similar to Schizophrenia.]" in a police report and to others. An independent investigation revealed that this was a fabricated statement by Officer Morgan and Hayward PD (see a true and accurate copy of communication regarding investigation findings in Exhibit C of Plaintiff Jane Doe's Declaration in Opposition to the Motion to Dismiss). Also see other false and defamatory statements in Plaintiff November 27, 2022 complaint to Hayward PD IAB (Plaintiff proffers a true and accurate copy of this document documenting numerous false statements and unlawful conduct.). 1. Defendant made one or more of the statement(s) to a person/persons other than Plaintiff including to Plaintiff's husband and other officers verbally and to the law enforcement community in public police reports easily accessible to police

officers in a database; 2. That these people reasonably understood that the statement(s) were about Plaintiff; 3. That these people reasonably understood the statement(s) to mean that Plaintiff was mentally ill. 4. That Defendants failed to use reasonable care to determine the truth or falsity of the statement(s).

ix. ***Plaintiff Requests Leave to Amend to Drop Her Fourth Amendment Cause of Action and A Fifth Amendment Cause of Action***

Plaintiff requests leave to amend her complaint to add a cause of action for the Fifth Amendment with respect to due process violations, as she had a right to petition the government and a right to fair treatment, as well as add defamation per quod. Plaintiff is willing to remove her Fourth Amendment claim and reserves the right to assert that claim and relevant information if and once it becomes available. Plaintiff also requests leave to amend to add factual allegations and other detail in support of her claims. Plaintiff also requests leave to amend, such that she is able to address any other deficiencies identified by the Court.

## V.  CONCLUSION

In light of the foregoing, the plaintiff respectfully requests that the court deny the Defendants' Motion to Dismiss and allow this case to proceed. The Defendants' arguments do not warrant the dismissal of any claims, and the plaintiff is entitled to their day in court to seek redress for the damages suffered. If the Court is inclined to dismiss, Plaintiff requests leave to amend to address any deficiencies.


Respectfully Submitted,

/s/ Jane Doe

Jane Doe, In Propia Persona
October 30, 2023 in San Mateo County

1
2
3
4

Jane Doe
5424 Sunol Blvd, Suite 10-475
Pleasanton, CA 94566
510-679-1288
janedoevhpd@gmail.com
In Propria Persona

5    **UNITED STATES DISTRICT COURT**

6    **NORTHERN DISTRICT OF CALIFORNIA**

7    (San Francisco)

8

9    JANE DOE
              Plaintiff,
              v.

Case No: 3:23-cv-05007-SK

10

11   CITY OF HAYWARD, a municipal
     corporation; HAYWARD POLICE
     DEPARTMENT; TONY CHAPLIN,
     individually and in his capacity as Chief of
     Police for the City of Hayward; DANIEL
     MORGAN, individually and in his capacity
     as a police officer for the City of Hayward;
     ALEX IWANICKI, individually and in his
     capacity as a police officer for the City of
     Hayward; SGT ZACHARY HOYER,
     individually and in his capacity as a police
     supervisor for the City of Hayward; SGT
     FAYE MALONEY, individually and in her
     capacity as a police supervisor for the City
     of Hayward, ROES 1 to 50, inclusive,

**DECLARATION OF PLAINTIFF JANE
DOE WITH EXHIBITS IN SUPPORT
OF OPPOSITION TO MOTION TO
DISMISS**

Date: January 25, 2024 at 8:00 A.M

Location: to Courtroom 12 – 19th Floor (SF)

Judge: Honorable William Alsup

12
13
14
15
16
17
18
19

20                Defendants.

21

22   I, Jane Doe, declare:

23   **1 -** I am the Plaintiff, Jane Doe, Ph.D. ("Plaintiff") in the above-entitled matter. I have personal

24   knowledge of the facts reported in this declaration, and if called to testify about them, I could

25   and would do so competently.

26   **2 -** Plaintiff respectfully requests that the Court overrule Defendants' Motion to Dismiss in its

27   entirety.

28

**3 -** As background, Plaintiff became a victim of serial crime following her objection to sexual harassment and stalking at the University of California, as determined by experts in Declarations. [These expert reports from two private investigator firms and PhD statisticians (for example, see **Exhibit A** to Jane Doe's Declaration in Support of Opposition to Motion to Dismiss ("Opposition") for a true and accurate report from Bardwell Consulting, indicating that the crime pattern to which Plaintiff and her family were subjected is targeted and not random) were provided prior to Hayward PD and determined that Plaintiff is a victim of serial crime.]

**4 -** As determined by (additional, separate) expert Professor Phyllis Gerstenfeld, PhD in Psychology and JD, Plaintiff is a victim of "hate crime" and of "terrorism" (See **Exhibit B of** Jane Doe's Declaration in Support of Opposition for a true and accurate copy of this expert report demonstrating that Plaintiff is reliable and credible victim of major crime, pages 4-7, also provided in person and electronically to Hayward PD including but not limited to Sergeant Clayton, Sergeant Irizarri, Seargeant Hoyer, Officer Morgan, and Chief Chaplin in or about May 2022 and afterward). Plaintiff has also made multiple reports of crime to the Hayward PD from 2014 onward.

**5 -** Defendants therefore had knowledge that Plaintiff had been determined by qualified, third party experts to be a victim of serial crime, of hate crime and of terrorism. Defendants had prior knowledge of Plaintiff's prior filed credible police reports with substantial evidence.

**6 -** Plaintiff came to the Hayward PD lobby on May 27, 2022 to file a police report regarding sexual assault/battery and hate crime at approximately 11:45am. Thereafter, Defendants subjected Plaintiff to multiple tortious acts and other misconduct, for which Plaintiff pursues the following causes of action: 42 U.S. Code § 1983; First, Fourth, & Fourteenth Amendments; Monell Claim; 42 U.S. Code § 1985 Conspiracy to Violate Rights; 42 U.S. Code § 1981; Cal. Civ. Code § 52.1; Retaliation; Defamation; Defamation Per Se; Invasion of Privacy; Negligence;

Negligence Per Se; Negligent Infliction of Emotional Distress; and Intentional Infliction of Emotional Distress.

**7 -** At the police department, Plaintiff provided Defendants with two different expert reports (from Dr. Liu, former Professor of Electrical Engineering at Northwestern University and University of Chicago-Urbana Champaign, and from AAA Security firm comprised of engineers specializing in electronic computational assessment of samples for electronic/semi-conductor technology) evaluating the type of foreign object(s) extracted from her intimate parts and identifying the foreign object(s) as electronic device/semi-conductor technology. [Plaintiff proffers true and accurate copies of these expert reports per the Court's preference or instruction.]

**8 -** By petitioning and seeking redress from the government, Plaintiff was engaged in a constitutionally protected activity. On May 27, 2022, Defendants made false statements on police report indicating a) that Plaintiff was an informant (which is false but puts Plaintiff at risk in a police report, as "snitches" are disfavored and understood to have made some deal after having been caught in a crime) b) that she was suspicious and c) that she suffered from a serious mental illness; harassed her by forcing her to wait standing to the point of exhaustion; threatened and intimidated Plaintiff by making her feel surrounded in her vehicle and threatening her with a 5150 without cause; omitting pivotal expert reports and other information from the police report; violating Department policies about honesty and accurate documentation; misrepresenting her husband's testimony and attempting to manipulate him with hostility in a police effort to discredit Plaintiff; treating Plaintiff disparagingly and subjecting her to humiliation and anxiety; Defendants Morgan, and Supervisor Sgt Hoyer refused to end their tortious course of conduct, as well as Officer Iwanicki did not intervene to correct abuses on the scene.

**9 -** Notably, Officer Morgan fabricated and published information in his police report that Plaintiff had a severe mental illness and attributed this negative characterization to a mental health worker. An independent whistleblower investigation by Alameda County's division of mental health revealed that no such statement had been made by this mental health worker (see **Exhibit C** of Jane Doe's Declaration in support of Opposition for a true and accurate copy of email communication regarding the County's investigation conclusions); therefore, the Hayward PD fabricated information and made a false statement in order to discredit Plaintiff. Officer Morgan and Sgt Hoyer also refused to link this police report to the many others filed by Plaintiff, consistent with their linked police reports (for stalking cases) policy.

**10 -** Officer Morgan's colleagues failed to intervene and his supervisors including IAB Sgt Maloney and Chief of Police Chaplin approved of this tortious conduct when it was brought to their notice.  Plaintiff complained to the Department's Internal Affairs Bureau (IAB) on November 27, 2022. As detailed in her IAB complaint provided to Defendants, Plaintiff reported that Defendants also violated the following policies from the Hayward PD Policy Manual (2021): Hayward PD Mission Statement,  324.3.5(c) unsatisfactory work performance, 324.3.5(f) wrongful exercise of authority, 324.3.5(i) falsification of work-related records, 324.3.5(m) knowing or negligent violation of Department manual provisions, 324.3.5(p) omission or misrepresentation of material information in any police report, 324.3.5(q) failure to take reasonable action, 324.3.5(z) violating any misdemeanor or felony statute, 324.3.5(ab) failure of employee to properly perform, 324.3.5(ae) police honesty, and p.283 reports are detailed and free from error. Finally, officers violated CA Penal Code 118.1 (knowingly making false statement in report).

**11 -** Subsequently, Plaintiff emailed Sgt Maloney at least twice about her allegations (January 4, and February 14, 2023) as well as Chief Chaplin on at least three occasions (December 26, 2022,

January 3, February 14, 2023). Chief Chaplin and Sgt Maloney were therefore aware about the problem Hayward PD had created for Plaintiff; but they refused to take remedial action with training or other action including but not limited to refusing to correct the false statements, refusing to include pivotal information that had been omitted from the police report, and/or refused to follow the Department's policy of disciplining officers who make false statements[1] (342.5 (ae) An officer found to have lied intentionally in any official document…shall be terminated). (Hayward PD Policy Manual 2021.)  That is, Defendants created a police report with false and defamatory statements, knowing that the report is highly discrediting, and they refused to correct the false information, even and in spite of multiple requests by Plaintiff with information that contradicts the false information. Defendant supervisors treated Plaintiff with bias and never contacted Plaintiff to interview her nor to request additional information from her after the IAB complaint, simply "determining" that it was unfounded.

**12 -** Defendants promulgated and/or failed to promulgate policies and procedures regarding the unlawful conduct and failed to discipline officers complained of, demonstrating an entrenched culture, policy and/or practice of promoting, tolerating and/or ratifying unlawful conduct with deliberate indifference. Defendants were deliberately indifferent toward training or supervision.

**13 -** Plaintiff's constitutionally protected activity was a substantial or motivating factor for Defendants' acts; Defendants' acts would likely have deterred a reasonable person seeking redress from the government; and Plaintiff was harmed as a result of Defendant's conduct. As a serial crime victim, Plaintiff must maintain her credibility in order to make further police reports. Hayward PD discredited Plaintiff in their police report. Therefore, Plaintiff was at risk of further biased treatment for anyone who accessed the police report, a public document subject to open

records laws and subpoenas, for which Defendants subsequently received requests for Plaintiff's records by third parties, increasing Plaintiff's anxiety.

**14 -** As a victim of sexual battery/assault/abuse, Plaintiff filed her complaint in Alameda County Superior Court on July 6, 2023 under the pseudonym "Jane Doe" to safeguard her privacy and safety. Filing pleadings with pseudonyms is common in cases with victims of sexual misconduct or abuse (Starbucks Corp. v. Superior Court (2008) 168 Cal. App. 4th) 436,) 452.).

**15 -** On or about September 29, 2023, Defendants filed a Notice of Removal, initiating case transfer to United States District Court of Northern California. The district court required Plaintiff to "file a motion to proceed anonymously" and to request e-filing permission from the courtroom deputies (Plaintiff has complied but is still waiting for permission to e-file).

**16 -** Defendants filed a Motion to Dismiss on October 6, 2023.

**17 -** Plaintiff has received medical treatment due to pain and suffering and severe emotional distress caused by Defendants' action. Plaintiff is an eggshell plaintiff.

**18 -** Plaintiff is a crime victim and university professor who must maintain her credibility in order to report future events and in order to do her job. Defendants' misconduct oppressed Plaintiff, silencing her with their biased, threatening, intimidating acts such that she has not filed a police report since.

**19 -** On October 18, 2023, Plaintiff filed her Motion for Leave to Proceed Under Pseudonym.

**20-** On October 20, 2023, Parties filed a joint stipulation to extend the deadline for Plaintiff's Opposition to Motion to Dismiss until October 30, 2023.

**21 -** On October 30, Plaintiff filed her Opposition to Motion to Dismiss, respectfully requesting that the Court overrule the Motion to Dismiss in its entirety. If the Court is inclined to dismiss, Plaintiff requests leave to amend.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**22** – Plaintiff respectfully submits this declaration to the Court in support of her Opposition to Motion to Dismiss.

I declare under penalty of perjury under the laws of the United States and of the State of California that the foregoing is true and correct, and that this Declaration is executed on October 30, 2023 in San Mateo County, California.

/s/ Jane Doe

Jane Doe, In Propia Persona

# EXHIBIT A (IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS)

# Report Regarding

# The Implications of Multiple Crime Reports in a Short Span of Time

---

July 14, 2016

**Prepared for:**

███████████████

███████████████

███████████████

---

**Bardwell Consulting Ltd**
4801 W. Yale Ave.
Denver, CO 80219
Voice: 303-934-3851
Fax: 888-228-4751
www.bardwellconsulting.com

## 1. INTRODUCTION AND SUMMARY OF FINDINGS

This report evaluates the probability that a sequence of 7 police reports made by ▮▮▮▮▮▮▮ between October 27, 2010 and June 1, 2016 are random and independent events consistent with the average rate of police reports in ▮▮▮▮▮ neighborhood. I model these events as a Poisson process with an average report rate of 0.02 reports per household per year. I find that the probability that the number of police reports made by ▮▮▮▮▮ is typical of this area is less than $1.1 \times 10^{-10}$. This means that there is less than 1 chance in 10 billion that ▮▮▮▮▮ recent crime experience was the result of random, independent crime. My estimate is actually conservatively high because it was calculated using an upper bound of the highest rate of household police reports over all areas ▮▮▮▮▮ lived in during the period of interest. This analysis spans multiple household locations, so the inference is not about crime in a specific location, but rather clear evidence of the victimization of a particular individual and household that followed them when they moved. I find a qualitative change in ▮▮▮▮▮ security occurred sometime around 2010.

## 2. METHODOLOGY

Life is full of events that occur occasionally and unpredictably: the points in time your car gets a flat tire, the times you win something from the lottery, or the times you see a car just like yours on the highway. The random sequence of times when unpredictable events like these occur can often be very accurately modeled as a Poisson process. The reason the Poisson process is applicable in so many different situations can be explained very simply. For a sequence of events to be a Poisson process, it is only necessary[1] that the number of events that occur in disjoint spans of time are statistically independent, Ross (2014). A Poisson process is specified by a single parameter, its "rate," which is the average number of events per unit time. It is therefore very easy to use Poisson processes in statistical models since there is only one parameter that needs to be estimated, and models based on Poisson processes are quite trustworthy since they rely on so few assumptions, Ross (2014). For my purposes here, the only fact about Poisson processes I need is that the probability there are $k$ events in a span of $t$ time units is $e^{-rt}\frac{(rt)^k}{k!}$, where $r$ is the rate parameter.

Normally, the points in time that a given individual or household needs to report a crime are a text book example of a Poisson process. The crime-report events are relatively rare, and occur at a rate that is specific to each location or neighborhood. When crimes happen to an individual at random, the numbers of reports made in disjoint intervals of time are statistically independent, so the crime reports will follow a Poisson process consistent with the local crime rate. However, if an individual is systematically targeted, he/she can have a crime report rate substantially higher than average. Thus, if the times of the crime-report events are not independent – for example, if an individual is being victimized – then it should be possible to determine, statistically, that the resulting crime reports are not samples from the Poisson process corresponding to crime reports in the individual's

---

[1] There are a few technical mathematical conditions as well, but they are not relevant to this discussion.

location.

███████████ household has maintained a primary residence in two different zip codes since 2004. I calculate the annual crime report rate for each zip code by dividing the number of reports within the year by the number of households in the year.[2] The year and location with the highest crime report rate are used to estimate an upper bound on each annual locational crime rate. The highest crime rate occurred in 2013 at zip code 94542. The highest crime rate is 0.02 reports per year per household. This translates into 2 reports per year for every 100 households. Obviously, the number of reports by an individual cannot be larger than the total number of reports for his/her household, so 0.02 reports per year is also a bound on the rate that individuals report crime in those locations.

Both locations have crime report rates that are substantially lower than the national average. For the following statistical analysis, a value $r = 0.02$ will be used as the Poisson rate (crime reports per year per individual or household) in these locations. In other words, in the neighborhoods ███ ██ has lived in since 2004, a given individual (or household) ordinarily needs to file a crime report in a given year less than 2% of the time. Between January 1, 2010 and June 1, 2016, █████ made 7 crime reports herself, and other members of her household made 5 additional reports. These statistics are well above what one would expect. An average household in similar neighborhoods would not report a single crime over this time period. The magnitude of the anomaly can be calculated from a test of hypothesis based on the mathematical model.

## 3. FINDINGS AND CONCLUSIONS

My null hypothesis is that ████████ experienced crime at the same rate as other individuals and households in her neighborhoods, meaning that crime reports occur (statistically) as a Poisson process with rate $r = 0.02$, and that the elevated rate of reports in ████████ case is attributable to chance. The alternative hypothesis is that █████ is not experiencing crime according to a Poisson process with rate $r = 0.02$. If the alternative hypothesis is true, then it follows that something is causing ██████ to report crime at a different rate than her neighbors, e.g., she is being victimized. The p-value for a household experiencing 7 (or more) crimes in 6.5 years is less than

$\sum_{i=7}^{\infty} e^{-(0.02)(6.5)} \frac{((0.02)(6.5))^i}{i!} = 1.1 \times 10^{-10}$ which is sufficiently small so that the null hypothesis is soundly rejected.[3] If the additional 5 reports from other members of ████████ household are included then the p-value is indistinguishable from zero: $p = \sum_{i=12}^{\infty} e^{-(0.02)(6.5)} \frac{((0.02)(6.5))^i}{i!} = 4.3 \times 10^{-20}$. Note that in the 6 years prior to January 1, 2010, ████████ household reported no crimes. In that time span the corresponding p-value is $e^{-(0.02)(6)} = 0.887$. This means that there is an 88.7 percent probability that a household subject to the usual neighborhood crime rates would make no crime reports over a six year period. Prior to 2010 ████████ household crime experience

---

[2] As reported by Alameda County Sheriff's Department.

[3] As reported by the US Census American Community Survey.

was consistent with the standard neighborhood Poisson process. The null hypothesis was valid until January 1, 2010, but not after that time. In other words, something changed sometime around January 1, 2010, and since that time, ███████ and her household has been subjected to a level of crime that cannot be explained by chance.

January 1, 2010 represents a natural break point to test for a change in crime rate for ███████ household because it separates a prolonged period of no reports and a period of consecutive reports. However, I can test the hypothesis that the increased level of crime began at a date other than January 1, 2010. In this case I take my null hypothesis to be that ███████ and her household experienced a crime rate of $r = 12/6.5$ crime reports per year (the empirical rate for ███████ household in the period from January 1, 2010 to June 1, 2016) from a given date up to January 1, 2010. For example, the p-value for the null hypothesis from January 1, 2007 to January 1, 2010 is $e^{-(3.0*r)} = .0039$, so it is very unlikely that the change occurred before January 1, 2007. On the other hand, the p-value for the null hypothesis from January 1, 2009 to January 1, 2010 is $e^{-(1.0*r)} = 0.158$, so the change could have started before 2009 (the null hypothesis cannot be rejected in this case).

## 4. CONCLUSION

In summary, the statistical tests I performed show that with very high certainty (i.e. with an error of approximately one in ten billion) ███████ (and her household) has been criminally victimized far more than can be explained by the local crime rate in the period between January 1, 2010 and the present. This analysis is based on conservatively high estimates of the local crime rates where she lived. This means that ███████ has been serially victimized by criminal activity since at least 2010.

_____                    _____7/19/16_____
Burton Simon, Bardwell Consulting Ltd.              Date

## 5. SOURCES

*Ross, Sheldon M. Introduction to Probability Models, Eleventh Edition. Academic Press, 2014.*

# EXHIBIT B (IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS)



CALIFORNIA STATE UNIVERSITY

**Stanislaus**

**Author Background**

My name is Phyllis B. Gerstenfeld. I hold a PhD in Psychology and a JD from the University of Nebraska, Lincoln. I'm professor and chair of criminal justice at California State University, Stanislaus. I'm an internationally recognized expert on hate crime. I've been researching hate crime for approximately 30 years, have written a book on the subject (now in its fourth edition) as well as several journal articles, and have presented papers on hate crimes at numerous academic conferences in the United States and Europe.

I've spent considerable time reviewing ███████ materials, including police reports, independent analyses, and her own reports of events.

**Potential Hate Crime Charges**

Federal law (specifically, 18 U.S.C. § 249), provides criminal penalties for anyone who:
*[W]illfully causes bodily injury to any person… because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person*
The statute further requires that the perpetrator use:
*a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described*
In my estimation, the offenses committed against ███████ fall under this definition.

**Gender-Based Hate Crimes**

*Gender as a Protected Category*

The inclusion of gender as a protected category in hate crime legislation has been controversial.[1] Some critics had worried that doing so will result in a landslide of hate crime cases, since most sexual assaults and intimate partner violence could, at least in theory, be charged as hate crimes. In reality, no such landslide has occurred in jurisdictions that include gender, such as California. In fact, as I

---

[1] See, e.g., McPhail (2002). Gender-Bias Hate Crimes: A Review. 3(2) Trauma, Violence & Abuse 125. See also Schweppe, J. & Hayes, A. (2020). You Can't Have One Without the Other One: "Gender" in Hate Crime Legislation, 2 Crim. Law Rev. 148.

**Department of Criminal Justice**
One University Circle | Bizzini Hall C125 | Turlock, CA 95382 | **T** 209.667.3409 | **F** 209.664.7134 | csustan.edu/criminal-justice
*A proud member of the 23-campus California State University system*

E N G A G I N G  ·  E M P O W E R I N G  ·  T R A N S F O R M I N G

mentioned in the previous section, hate crime prosecutions based on gender are very rare.

Another concern was that inclusion of gender would result in sexual and intimate partner violence being buried under the larger umbrella of hate crime, and thus these offenses wouldn't receive the attention they deserve. Again, there's no evidence that this has happened.

The third argument against inclusion of gender has been a more conceptual one. Critics have claimed that gender-based hate crimes are different from those based on things such as race and religion because, in gender cases, the offender usually knew the victim and chose her specifically, whereas in other cases the victims were strangers chosen only due to their group affiliation. However, this argument lacks factual support on several counts.

For one thing, even in cases motivated by race and religion, it's not unusual for the offender and victim to be acquainted in some way. Weisburd and Levin (1994), for example, cite the famous case of Emmett Till, a fourteen-year-old boy who was murdered by two white men in Mississippi in 1955.[2] Emmett Till wasn't chose at random, but rather because he was an African American accused of whistling at a white woman.

Secondly, many gender-based victims *have* been chosen at random. Examples of this include Marc Lepine, who separated the women from men in a University of Montreal classroom before murdering 14 women; Elliot Rodger, who murdered six people near Santa Barbara in 2014 as part of a planned revenge against women in general and against sexually successful men; and Billy Dean McCall, the defendant in the California case described in the previous section.

In a larger sense, gender-based hate crimes are the result of a particular brand of bias—misogyny—in the same way that other hate crimes are the result of biases against race, religion, and so on. In fact, it's been argued that misogyny and twisted ideas of masculinity lie behind a large percentage of hate crime, and that misogyny is closely tied to other forms of bias; offenders may lash out whenever they feel that their power is threatened.[3]

One area in which this link between misogyny, gender-based hate crime, and other forms of bias is evident is the Incel movement. Members of this movement (the name of which stands for "involuntarily celibate") are men who are unable to obtain sexual or romantic partners and blame women for their failures. In some cases, Incels have committed violence against women, including several mass

---

[2] Weisburd, S.B. & Levin, B. (1994). On the Basis of Sex: Recognizing Gender-Based Bias Crimes, 5 Stan. L. & Pol'y Rev. 21

[3] See, e.g., Treadwell, J. & Garland, J. (2011). Masculinity, Marginalization and Violence: A Case Study of the English Defence League, 51(4) British Journal of Criminology 621.



CALIFORNIA STATE UNIVERSITY
Stanislaus

murders.[4] They're listed as a hate group by The Southern Poverty Law Center.[5] Incels may sometimes have formal or informal ties to white supremacist groups.[6]

The Incel movement isn't the only example of the link between misogyny and other forms of hate. White supremacist groups are often explicitly anti-feminist and advocate for women being consigned to traditional household roles. Internet trolls frequently combine misogyny with other forms of bias in their posts; an example of this is memes in which it's claimed that First Lady Michelle Obama is, in fact, a man or a transgender woman. Anders Breivik combined misogynistic, xenophobic, and anti-Islamic ideation in the lengthy manifesto that preceded his murder of 77 people.[7]

Gender bias seems as legitimate and important of a concern as other forms of bias, and gender is included in both the California and federal laws. However, as suggested by the prosecution and conviction statistics, prosecutors may be hesitant to act in such cases. Levin and McDevitt (1993), for example, suggest that perhaps gender-based offenses should be treated as hate crimes only when the victim is "interchangeable;" that is, when the offender sought to harm *any* woman rather than a particular one.[8] Informally, this may be the model many prosecutors follow. Furthermore, at least one study suggests that jurors may be reluctant to reach a guilty finding in gender-bias cases.[9]

*Offenders*

Very little research has been done on gender-based hate crime, so little is known about the offenders. We can, perhaps, extrapolate from what we know about hate crime offenders in general.

---

[4] Crimando, S. (2019, March). Alone Together and Angry: An Incel Revolution. Security Management, 33.

[5] https://www.splcenter.org

[6] Taub. A. (2018, May 9). On Social Media's Fringes, Growing Extremism Toward Women. New York Times., Retrieved from https://www.nytimes.com/2018/05/09/world/americas/incels-toronto-attack.html. See also, Futrell, D. (2019, April 1). The "Alt-Right" Is Fueled By Toxic Masculinity—And Vice Versa. NBC News. Retrieved from https://www.nbcnews.com/think/opinion/alt-right-fueled-toxic-masculinity-vice-versa-ncna989031.

[7] See, e.g., Edström, M. (2016). The Trolls Disappear in the Light: Swedish Experiences of Mediated Sexualised Hate Speech in the Aftermath of Behring Breivik, 5(2) International Journal for Crime, Justice, and Social Democracy 96.

[8] Levin, J. & McDevitt, J. (1993). Hate Crimes: The Rising Tide of Bigotry and Bloodshed. New York, NY: Plenum.

[9] Plumm., K.M., & Terrance, C.A. (2013). Gender-bias hate crimes: what constitutes a hate crime from a potential juror's perspective? 43 Journal of Applied Social Psychology 1468.

**Department of Criminal Justice**

One University Circle | Bizzini Hall C125 | Turlock, CA 95382 | **T** 209.667.3409 | **F** 209.664.7134 | csustan.edu/criminal-justice
*A proud member of the 23-campus California State University system*

E N G A G I N G  ·  E M P O W E R I N G  ·  T R A N S F O R M I N G

For one thing, the vast majority of offenders do not belong to organized hate groups. Levin (2002) estimated that about 95% of hate crimes are committed by unaffiliated people,[10] and in a study of hate crime offenders in Los Angeles, fewer than 14% had been affiliated with a hate group.[11] However, hate crime offenders are more likely than other offenders to act in small, informal groups.[12]

The majority of hate crime offenders are white,[13] most are male, most are not particularly economically disadvantaged, and most have little or no previous contact with the criminal justice system.[14]

As for what motivated these offenders, again we know little about gender-based offenders. However, as discussed above, it's very likely that they act due to misogynistic beliefs as well as perceived threats to their power. It's logical, therefore—but unproven—that they might be especially likely to act against specific women who threaten their power. This could include women who deny their sexual advances as well as women who achieve success in the offender's profession. Both of these characteristics apply in ▮▮▮▮ situation.

*Applicability to* ▮▮▮▮ *Victimization*

There have been several events constituting bodily injury: assaults with electronic devices that were implanted in ▮▮▮▮ body; heavy metal poisoning; a dog attack; tampering with ▮▮▮▮ car; attempted carjacking/robbery; attempted kidnapping of ▮▮▮▮ son. Thus the first part of the statute has been satisfied.

It's important to note that not all events have intended or resulted in bodily injury. For example, there have been incidents of identity theft and attempts on the Internet to falsely link ▮▮▮▮ to terrorism. While these specific action might not be covered under the federal law (they would probably be covered under state hate crime law, however), they provide further evidence of an ongoing and concerted effort to harm ▮▮▮▮.

There is also evidence that, especially when viewed in its entirety, suggests that ▮▮▮▮ was targeted due to her gender.

---

[10] Levin, J. (2002). The Violence of Hate: Confronting Racism, Anti-Semitism, and Other Forms of Bigotry. Boston, MA: Allyn & Bacon.

[11] Dunbar, E. (2003). Symbolic, relational, and ideological signifiers of bias motivated offenders: Toward a strategy of assessment. 73(2) American Journal of Orthopsychiatry 203.

[12] Pezzella, F.S. & Fetzer, M.D. (2015). The likelihood of injury among bias crimes: An analysis of general and specific bias types. 32(5) Journal of Interpersonal Violence 703.

[13] Nolan, J.J., Akiyama, Y., & Berhanu, S. (2002) The Hate Crime Statistics Act of 1990: Developing a method for measuring the occurrence of hate violence. 46 American Behavioral Scientist 136.

[14] Craig, K. (2002). Examining hate-motivated aggression: A review of the social psychological literature on hate crimes as a distinct form of aggression. 7 Aggression & Violent Behavior 85.



CALIFORNIA STATE UNIVERSITY
# Stanislaus

- █████ was targeted after rejecting sexual advances
- The individual acts are part of a pattern of behavior, some of which focuses not just on █████ but on her family
- A few of the instances included what could be interpreted as gender-focused language
- The length, degree, and complexity of the attacks show they were motivated by something more than simple frustration or anger. They're more akin to the kinds of planned attacks sometimes seen among Incels
- █████ challenged the offender's feelings of power, both by rejecting him and also by achieving success in his field

Proof of the offender's motive could be shored by additional evidence, such as information that the offender has similarly harassed other women or that he has engaged in writing or behaviors demonstrating animosity toward women.

While hate crime prosecutions based on gender have been rare, they have occurred. And several scholars have pointed out that misogyny and other forms of bias are often closely related.

In a larger sense, gender-based hate crimes are the result of a particular brand of bias—misogyny—in the same way that other hate crimes are the result of biases against race, religion, and so on. In fact, it's been argued that misogyny and twisted ideas of masculinity lie behind a large percentage of hate crime, and that misogyny is closely tied to other forms of bias; offenders may lash out whenever they feel that their power is threatened.

One area in which this link between misogyny, gender-based hate crime, and other forms of bias is evident is the Incel movement. Members of this movement (the name of which stands for "involuntarily celibate") are men who are unable to obtain sexual or romantic partners and blame women for their failures. In some cases, Incels have committed violence against women, including several mass murders. They're listed as a hate group by The Southern Poverty Law Center. Incels may sometimes have formal or informal ties to white supremacist groups.

The Incel movement isn't the only example of the link between misogyny and other forms of hate. White supremacist groups are often explicitly anti-feminist and advocate for women being consigned to traditional household roles. Internet trolls frequently combine misogyny with other forms of bias in their posts; an example of this is memes in which it's claimed that First Lady Michelle Obama is, in fact, a man or a transgender woman. Anders Breivik combined misogynistic, xenophobic, and anti-Islamic ideation in the lengthy manifesto that preceded his murder of 77 people.

**Department of Criminal Justice**
One University Circle | Bizzini Hall C125 | Turlock, CA 95382 | **T** 209.667.3409 | **F** 209.664.7134 | csustan.edu/criminal-justice
*A proud member of the 23-campus California State University system*

E N G A G I N G  ·  E M P O W E R I N G  ·  T R A N S F O R M I N G

Finally, channels and instrumentality of interstate and foreign commerce were used against ███. Specifically, the perpetrator used the Internet to harass ███ and to spread false information about her, such as falsely associating her with Muslim extremists. Items purchased via identity theft (e.g., cell phones) involved interstate commerce and were purchased in more than one state. Furthermore, the perpetrator attacked her and her family members with electronic devices which were, presumably, manufactured at least in part outside of California. The heavy metal poisons used at Panera also likely traveled via interstate commerce.

Based on this analysis, I conclude that a strong case could be made that ███ has been the victim of hate crimes in violation of 8 U.S.C. § 249.

## Potential Terrorism Charges

The overlap between hate crimes and domestic terrorism is substantial enough that some scholars argue they are essentially the same thing. Even those who disagree with this assertion, however, assert that many hate crimes can—and should—be viewed as domestic terrorism. Federal law defines domestic terrorism as *criminal acts intended to intimidate a civilian population or affect government policy or conduct* (18 U.S.C. § 2331). While most of the focus of domestic terrorism has been on white supremacist ideology, extreme misogyny has also been characterized as a potential motive for terrorist actions.

For example, a 17-year-old boy apparently inspired by the incel movement attacked women in a Toronto massage parlor, killing one of them. In May of this year, the perpetrator was charged with murder and terrorism. While this occurred in Canada, the same legal theory could be applied in the United States.

Some of the details of ███ case might make a terrorism claim stronger. One is the fact that she wasn't the only one targeted, but also several members of her family. This suggests a broader motive than simple stalking or revenge. Second, several pieces of sophisticated technology have been used in attacks against ███ and her family. Terrorists often make use of technology, including both hardware and computer networks. And the technology implies a sophistication more often seen in organized political schemes than in personal vendettas. Third, most of the technology has been used against female members of ███ family, both adults and children, with males having been mostly avoided. The case would be greatly strengthened by evidence of the perpetrator's misogynist political views or activities.



CALIFORNIA STATE UNIVERSITY
# Stanislaus

The attacks against ███ have continued over a long period. They've been intended to impact her physically, emotionally, and financially. If combined with evidence of similar actions against other women, it would seem clear that the acts were, as required by the statute, intended to intimidate a civilian population, specifically educated women.

Based on this analysis, I believe that domestic terrorism charges could be successfully levied against the person who victimized ███ and her family.

**Department of Criminal Justice**
One University Circle **|** Bizzini Hall C125 **|** Turlock, CA 95382 **|** **T** 209.667.3409 **|** **F** 209.664.7134 **|** csustan.edu/criminal-justice
*A proud member of the 23-campus California State University system*

E N G A G I N G  ·  E M P O W E R I N G  ·  T R A N S F O R M I N G

# EXHIBIT C (IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS)



---

## Alameda Co Behavioral Health Whistleblower Reporting

████████████████████                                    Tue, Jan 24, 2023 at 12:37 PM
To: "Compliance, HCSA" <HCSA.Compliance@acgov.org>

Thank you.

On Tue, Jan 24, 2023 at 12:23 PM Compliance, HCSA <HCSA.Compliance@acgov.org> wrote:

> Correct.
>
> ---
>
> **From:** ████████████████████
> **Sent:** Monday, January 23, 2023 6:32 PM
> **To:** Compliance, HCSA <HCSA.Compliance@acgov.org>; ████████████████████
> **Subject:** Re: Alameda Co Behavioral Health Whistleblower Reporting
>
> Dear Ravi,
>
> Thank you for your email.
>
> Clarification: I understand, then, that Mr. Henry did not make or denies making a negative characterization about my mental health. Please clarify if I am misinterpreting.
>
> I appreciate your assistance and look forward to hearing from you.
>
> Best wishes, thanks,
>
> ████
>
> On Mon, Jan 23, 2023, 5:15 PM Compliance, HCSA <HCSA.Compliance@acgov.org> wrote:
>
>> Hi, ████
>>
>> In your complaint, you alleged "that on May 27, 2022, Mr. Tim Henry participated in the bad acts of Hayward Police Department by disregarding relevant information and according to the police report, making an improper, alleged statement inconsistent with established medical procedures, which resulted in an unfounded, defamatory statement about me." In our meeting on 12/19/22, you asked me to look into this matter and I have done so. On 1/19/23, I sent you an email letting you know there is no evidence to suggest that our employee made negative characterization about your mental health as you alleged. We are not the authors of the police reports. If you have specific questions about the content of the report, we encourage you to speak with the Hayward Police Department.
>>
>> We currently do not have a committee that "works on new issues confronting mental health workers, including concern about how to handle potential chipping victims."

Per your request, I have attached the Crisis Training Manual. The training on trauma informed work specifically starts on page 131. In addition, the ACBH website also provides helpful/useful information regarding the types of services the department provides to the community, including mobile crisis services.


Best,

Ravi


**Notice of Confidentiality:** This message may contain confidential and/or protected health information. If you are not the intended recipient, you are prohibited from sharing, copying, downloading, or otherwise using or disclosing its contents. Unauthorized disclosure may subject the individual to civil or criminal penalties under state and federal privacy laws. If you have received this email in error, please notify the sender immediately by reply email and permanently delete this email and any attachments without reading, printing, forwarding or saving them. Thank you for your cooperation!

---

**From:** ██████████████████████
**Sent:** Thursday, January 19, 2023 3:28 PM
**To:** Compliance, HCSA <HCSA.Compliance@acgov.org>; █████████████████████
**Subject:** Re: Alameda Co Behavioral Health Whistleblower Reporting


Dear Ravi,


Thank you for your email. Several items to follow up on that I detail below:


1 - Were you able to review the expert reports I emailed to you, as well as obtain the body camera footage from the Hayward PD, showing that I carefully, calmly and systematically went over these expert reports with the officials present (the body camera footage also does show when and where Tim Henry and the Hayward PD were at the time that I went over the incident, so it should be easy to determine who, what, when, where as well as the evidentiary basis underpinning my victim report).

2 - Did Mr. Henry make the negative characterization about my mental health and undermining my report, as stated by Hayward PD Officer Morgan in the Hayward PD police report (and summarized by me in my police complaint)?

3 - Did you read the brief Cedars Sinai link that I sent you regarding chipping and human trafficking victims as a legitimate concern for medical providers? Were you able to follow up on the research?

4 - If there is an Alameda County Behavioral Health committee that works on new issues confronting mental health workers, including concern about how to handle potential chipping victims, then I would like to help that committee. Please let me know.

5 - Would you please forward me a copy of your manual and/or training on proper procedures?

6 - Do you have any procedures that are specifically relevant to crime victims and/or trauma-informed procedures?

7 - Did you forward my expert reports to supervisors for confidential review of a new and sensitive issue (chipping of women, including for sexual abuse), as we discussed? If so, who were they?


Thank you for your assistance in advance.


Best wishes,

█████

On Thu, Jan 19, 2023, 2:26 PM Compliance, HCSA <HCSA.Compliance@acgov.org> wrote:

Happy New Year, ████████

I hope this message finds you and yours in good health and spirits!

I want to thank you for taking the time to meet with me on December 19, 2022, to provide additional context to your complaint and share your perspective. Following our meeting, I met with our crisis team to discuss your concerns. My review found that our staff followed proper procedures and there is no evidence to suggest that our staff engaged in any wrongdoing.

Please let me know if you have questions or wish to schedule a short call to discuss this further.

Best,

Ravi

**Notice of Confidentiality:** This message may contain confidential and/or protected health information. If you are not the intended recipient, you are prohibited from sharing, copying, downloading, or otherwise using or disclosing its contents. Unauthorized disclosure may subject the individual to civil or criminal penalties under state and federal privacy laws. If you have received this email in error, please notify the sender immediately by reply email and permanently delete this email and any attachments without reading, printing, forwarding or saving them. Thank you for your cooperation!

---

**From:** █████████████████
**Sent:** Tuesday, December 6, 2022 10:42 AM
**To:** Compliance, HCSA <HCSA.Compliance@acgov.org>; ████████████████████
**Subject:** Re: Alameda Co Behavioral Health Whistleblower Reporting

Dear HCSA OCS Team,

Would you please inform me of your available time on December 12, 13 and 15?

Thank you and best wishes,

████████

On Thu, Dec 1, 2022, 8:03 AM Compliance, HCSA <HCSA.Compliance@acgov.org> wrote:

Dear █████████

The Alameda County Health Care Services Agency Office of Compliance Services (OCS) is in receipt of your complaint regarding a May 27, 2022 incident. We appreciate you reaching out to us with your concerns.

OCS would like to schedule a virtual meeting with you to discuss your complaint and get some additional information. Your meeting will be scheduled with our Chief Compliance Officer, Dr. Ravi Mehta. Below is his availability for next week. Please let us know which date/time works the best for you. Once you confirm, OCS will send you a calendar invite.

Monday, 12/5/22: 11, 12 or 1 PM

Tuesday, 12/6/22: 2 or 3 PM

Thursday, 12/8/22: 8 or 12 PM

Best,

HCSA OCS Team

**Notice of Confidentiality:** This message may contain confidential and/or protected health information. If you are not the intended recipient, you are prohibited from sharing, copying, downloading, or otherwise using or disclosing its contents. Unauthorized disclosure may subject the individual to civil or criminal penalties under state and federal privacy laws. If you have received this email in error, please notify the sender immediately by reply email and permanently delete this email and any attachments without reading, printing, forwarding or saving them. Thank you for your cooperation!

---

**From:** ███████████████████████
**Sent:** Sunday, November 27, 2022 6:40 PM
**To:** Program Integrity, ACBH <ProgIntegrity@acgov.org>
**Cc:** ████████████████
**Subject:** Alameda Co Behavioral Health Whistleblower Reporting

Dear Alameda County Behavioral Health,

Please find attached my whistleblower report regarding a May 27, 2022 incident.

Also, please acknowledge receipt of my email with attachment, thank you.

Respectfully submitted,

████████████

████████████████  (email preferred)

**\*\* This email was sent from an external source. If you do not know the sender, do not click on links or attachments. \*\***

1   Jane Doe

2   5424 Sunol Blvd, Suite 10-475
    Pleasanton, CA 94566
3   510-679-1288
    janedoevhpd@gmail.com
4   In Propria Persona

5

6                    **UNITED STATES DISTRICT COURT**

7                   **NORTHERN DISTRICT OF CALIFORNIA**

8                              (San Francisco)

9   JANE DOE                                Case No: 3:23-cv-05007-SK
                    Plaintiff,
10           v.

11  CITY OF HAYWARD, a municipal            **PROOF OF SERVICE**
    corporation; HAYWARD POLICE
12  DEPARTMENT; TONY CHAPLIN,
    individually and in his capacity as Chief of
13  Police for the City of Hayward; DANIEL
    MORGAN, individually and in his capacity
14  as a police officer for the City of Hayward;
    ALEX IWANICKI, individually and in his
15  capacity as a police officer for the City of
    Hayward; SGT ZACHARY HOYER,
16  individually and in his capacity as a police
    supervisor for the City of Hayward; SGT
17  FAYE MALONEY, individually and in her
    capacity as a police supervisor for the City
18  of Hayward, ROES 1 to 50, inclusive,

19

20                  Defendants.

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

1. **Case Name:**
   JANE DOE v. CITY OF HAYWARD, a municipal corporation; HAYWARD POLICE
   DEPARTMENT; TONY CHAPLIN, individually and in his capacity as Chief of Police for
   the City of Hayward; DANIEL MORGAN, individually and in his capacity as a police
   officer for the City of Hayward; ALEX IWANICKI, individually and in his capacity as a
   police officer for the City of Hayward; SGT ZACHARY HOYER, individually and in his
   capacity as a police supervisor for the City of Hayward; SGT FAYE MALONEY,
   individually and in her capacity as a police supervisor for the City of Hayward, ROES 1 to
   50, inclusive.

2. **Case Number:** 3:23-cv-05007-SK

2. **Documents served:**
   OPPOSITION TO MOTION TO DISMISS; DECLARATION OF PLAINTIFF JANE DOE
   WITH EXHIBITS; PROPOSED ORDER

**4. How was the document served? [check one]**
____ Placed in US Mail
____ Hand-delivered
____ Sent for delivery (e.g., FedEx, UPS)
____ Sent by fax
_X__ Electronic service

**5. Documents sent to (name and contact information):**
Ankush Agarwal <Ankush.Agarwal@hayward-ca.gov>
Sangeetha Waltz <Sangeetha.Waltz@hayward-ca.gov>

**6. Documents sent on date:**
October 30, 2023

I declare under penalty of perjury under the laws of the United States that the foregoing is true
and correct.

Signature:      /s/Jane Doe

Date:           October 30, 2023
Name:           Jane Doe