1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7

8                          NORTHERN DISTRICT OF CALIFORNIA

9

10   JANE DOE,

11          Plaintiff,                              No.  C  23-05007 WHA

12      v.

13   CITY OF HAYWARD, et al.,                       **TENTATIVE ORDER RE
                                                    DEFENDANT'S MOTION TO
14          Defendants.                             DISMISS AND ORDER TO SHOW
                                                    CAUSE**
15

16                                **INTRODUCTION**

17          In this civil rights and torts action, defendant police officers, police department, and

18   municipality move to dismiss plaintiff's claims, all of which stem from her filing of a criminal

19   complaint against unknown third parties and police defendants' subsequent disposition report

20   and decision not to further investigate.  What follows is a tentative order **GRANTING**

21   defendants' motion to dismiss, and an order to show cause.  This order is not final.  A final

22   order will be entered on March 20 following consideration of any additional briefing the

23   parties may choose to submit.

24                                **STATEMENT**

25          Plaintiff, a professor in the Bay Area, describes herself as "a victim of serial crime" (Dkt.

26   No. 20 at 5).  Between July 2010 and June 2016, plaintiff submitted seven criminal complaints,

27   while members of her household submitted five more (Dkt. No. 20 Exh. A at 36).  Although

28   specific dates and details are not reported in the pleadings, those complaints concerned, among

United States District Court
Northern District of California

1   other crimes: "heavy metal poisoning; a dog attack; tampering with [redacted] car; attempted

2   carjacking/robbery; [and] attempted kidnapping of [redacted] son" (Dkt. No. 20 Exh. B at

3   43). Many, if not all, of these criminal complaints were submitted to the Hayward Police

4   Department (Compl. 2).

5        Plaintiff has appended two reports to her opposition. The first, from Bardwell

6   Consulting, concludes that "[plaintiff] and her household has [*sic*] been subjected to a level of

7   crime that cannot be explained by chance" (Dkt. No. 20 Exh. A at 38). The second, attributed

8   to Phyllis Gerstenfeld, concludes that "[plaintiff] was targeted due to her gender," and that the

9   "the technology [used by the perpetrators] implies a sophistication more often seen in

10  organized political schemes than in personal vendettas" (Dkt. No. 20 Exh. B at 45-

11  46). Gerstenfeld concludes that "[plaintiff] has been the victim of hate crimes" and that

12  "domestic terrorism charges could be successfully levied against the person who victimized

13  [plaintiff] and her family" (*ibid*.). A third report, referenced but not on record, is attributed to a

14  Dr. Liu and is said to analyze the origins of the technology used by those victimizing plaintiff.

15       At issue here is plaintiff's most recent criminal complaint to HPD. On May 27, 2022,

16  plaintiff traveled to a HPD station to file a police report regarding an alleged sexual assault,

17  battery, and hate crime. Plaintiff reported that "a foreign object had been removed from her

18  intimate parts; that she had not consented to this penetration; that her husband was a witness to

19  its location and removal; that an engineering lab had identified the foreign object as an

20  electronic device/semiconductor; that a PhD in electrical engineering . . . Dr. Liu had identified

21  the lab that designed and manufactured this device" (Compl. 8-9).

22       Plaintiff now claims that police defendants harassed her while she gave her report on

23  May 27, and subsequently retaliated against her for making that report (Compl. 1-2). These

24  allegations fall into three categories: actions taken on May 27, inaccuracies in the resulting

25  report, and subsequent inaction despite plaintiff's repeated follow-up requests.

26       *First,* on May 27, plaintiff had to wait an hour and a half at the police station before her

27  statement was taken (Compl. 2). Defendants then "caused [plaintiff] to feel surrounded with 3

28  white males [Officers Daniel Morgan and Alex Iwanicki and social worker Tim Henry]

United States District Court
Northern District of California

United States District Court
Northern District of California

1   approaching her in what Plaintiff viewed as some sort of formation as she sat in her car"

2   (*ibid*.)  The officers took plaintiff's statement in the parking lot, interviewed her husband, who

3   was nearby, and reviewed the reports provided by plaintiff.  Plaintiff then spoke with social

4   worker Henry, who provided her with a pamphlet outlining available mental health

5   services.  Plaintiff alleges that these acts were intended to harass her.

6       *Second*, plaintiff alleges that the resulting police disposition report contained several

7   inaccuracies and falsehoods.  For example, the report stated that "[a]ll the reports [plaintiff]

8   downloaded from the Internet could not tell me the simple fact of how these tiny (half-inch

9   resistors) appeared in her vagina. These reports were not useful or relevant."  Plaintiff,

10   however, states that these reports evaluated evidence specific to her case and to "her status as a

11   victim of crime" (*id.* at 10).  The report stated that Officer Morgan "found no new evidence of

12   a crime" after speaking to plaintiff's husband; plaintiff, however, asserts that her husband

13   provided new evidence of the crime at hand (*ibid*.).  The report stated that plaintiff "offered no

14   rational explanation (*i.e.,* recent surgeries, a sexual assault, or suspects) for possible causes,"

15   and was only interested in "researching the company who manufactured the electronics to

16   support her conspiracy theory" (*id*. at 11).  Plaintiff states that she is in fact in a "systematic

17   investigation . . . NOT only . . . in researching the company who manufactured the

18   electronics," and that she never mentioned any "conspiracy theory" (*id*. at 12).  Finally, the

19   report allegedly stated that "the Alameda County Mental Health Clinician listened to [plaintiff]

20   and later made his assessment as delusional behavior, similar to Schizophrenia" (*ibid*.).

21   Plaintiff alleges that this characterization of her mental health is false, and that Alameda

22   County Behavior Services later stated that its clinician (presumably social worker Henry)

23   "never made a negative assessment" about her mental health (*ibid*.).

24       *Third*, plaintiff alleges that defendants retaliated against her after she submitted her

25   report.  Plaintiff sent emails to various defendants on May 27, June 1, June 4, November 27,

26   and December 26 of 2022, as well as January 3 and February 14 of 2023.  In these emails,

27   plaintiff asked defendants to make various changes to the May 27 report and to attach her own

28   "expert reports" to that report.  Defendants took no action.  Plaintiff's November 27

1    communication included a complaint to HPD internal affairs, which was forwarded to the City

2    Attorney's Office.

3        Plaintiff then filed the present suit, and defendants promptly removed. Defendants now

4    move to dismiss.

5                                    **ANALYSIS**

6    **1.    DEFENDANT'S MOTION TO DISMISS.**

7        In sum, plaintiff has failed to state a federal claim for relief.

8        *First*, plaintiff fails to claim that her First Amendment right to petition for the redress of a

9    grievance was violated. Our court of appeals has held that the filing of criminal complaints

10   falls within the First Amendment's right to petition. *Entler v. Gregoire,* 872 F.3d 1031, 1043

11   (9th Cir. 2017). Plaintiff was allowed to exercise that right on May 27. Defendants

12   interviewed plaintiff and her husband, reviewed her proffered expert reports, and issued a

13   disposition report. That is all the right to petition promises. Plaintiff does not have a right to

14   any particular investigation or prosecution. *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th

15   Cir. 2015) ("[Plaintiff] does not have a constitutional right to have the police investigate his

16   case at all, still less to do so to his level of satisfaction."). Plaintiff's later petitions were also

17   heard. Plaintiff's complaint dated November 27, 2022, to HPD internal affairs was promptly

18   forwarded to the City Attorney's Office, which investigated and determined it to be

19   unfounded. Plaintiff's complaint to Alameda County Behavioral Health Care Services was

20   also investigated: plaintiff was interviewed by Chief Compliance Officer Dr. Ravi Mehta, who

21   reviewed plaintiff's claims with a crisis team and reached the conclusion that his staff followed

22   proper procedures and did not engage in wrongdoing (Dkt. No. 20 Exh. C). If the follow-up by

23   defendants was inadequate, plaintiff's remedy is at the ballot box, not in federal court on this

24   theory.

25       Plaintiff's right to petition includes the right to do so without retaliation:

26           "The First Amendment forbids government officials from
             retaliating against individuals for speaking out. To recover under §
27           1983 for such retaliation, a plaintiff must prove: (1) he engaged in
             constitutionally protected activity; (2) as a result, he was subjected
28           to adverse action by the defendant that would chill a person of

United States District Court
Northern District of California

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> ordinary firmness from continuing to engage in the protected
> activity; and (3) there was a substantial causal relationship between
> the constitutionally protected activity and the adverse action."

*Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citations omitted).  As noted above, defendants' actions on May 27 and after were entirely unremarkable and fail the second prong above.

However, plaintiff's allegation that defendants' disposition report made false statements attacking plaintiff's mental health and credibility in order to dissuade further complaints merits discussion (Compl. ¶ 35).  First Amendment retaliation claims generally concern "exercises of governmental power that are regulatory, proscriptive, or compulsory in nature and have the effect of punishing someone for his or her speech."  *Mulligan v. Nichols*, 835 F.3d 983, 988 (9th Cir. 2016) (cleaned up).  Here, plaintiff instead alleges that defendants chilled her right to petition through speech of their own (*i.e.,* the statements within the disposition report).

The bar for retaliation claims grounded in government speech is a high one.  As our court of appeals explained in *Mulligan*:

> Retaliation claims involving government speech warrant a cautious
> approach by courts.  Restricting the ability of government
> decisionmakers to engage in speech risks interfering with their
> ability to effectively perform their duties.  It also ignores the
> competing First Amendment rights of the officials
> themselves.  The First Amendment is intended to preserve an
> uninhibited marketplace of ideas in which truth will ultimately
> prevail.  That marketplace of ideas is undermined if public officials
> are prevented from responding to speech of citizens with speech of
> their own.  In accordance with these principles, we have set a high
> bar when analyzing whether speech by government officials is
> sufficiently adverse to give rise to a First Amendment retaliation
> claim.

*Id.* at 989 (cleaned up).

It is beyond cavil "that damage to reputation is not actionable under § 1983 unless it is accompanied by some more tangible interests."  *Patton v. Cnty. of Kings*, 857 F.2d 1379, 1381 (9th Cir. 1988).  Our court of appeals held in *Gini v. Las Vegas Metropolitan Police Department* that this basic limitation on Section 1983 "cannot be avoided by alleging that defamation by a public official occurred in retaliation for the exercise of a First Amendment right."  40 F.3d 1041, 1045 (9th Cir. 1994).  There, the plaintiff alleged that the defendant

United States District Court
Northern District of California

1   police officers retaliated against her filing of an internal affairs complaint by making

2   defamatory statements about her to her employer (a federal judge), thereby causing her to be

3   terminated.   *Id*. at 1043-44.  Our court of appeals affirmed the dismissal of her retaliation

4   claim against the city, holding that defamation by government officials does not establish a

5   First Amendment claim in the absence of "state action affecting [plaintiff's] rights, benefits,

6   relationship or status with the state."  *Id*. at 1045; *see Nunez v. City of Los Angeles*, 147 F.3d

7   867, 875-76 (9th Cir. 1998) (holding that allegations of "mere threats and harsh words" did not

8   suffice to state a First Amendment employment claim against defendant government employer

9   absent "the loss of a valuable governmental benefit or privilege") (internal quotation omitted).

10  *Mulligan* confirmed once more that a First Amendment retaliation claim based on government

11  speech must be accompanied by a "decision or . . . state action affecting [plaintiff's] rights,

12  benefits, relationship or status with the state" or a "threat of invoking legal sanctions [or] other

13  means of coercion, persuasion, and intimidation."   835 F.3d at 989, n. 5 (internal quotations

14  omitted).  In *Mendocino Environmental Center v. Mendocino County*, for example, evidence

15  that police officers made false accusations of criminal activity against plaintiffs established a

16  First Amendment claim because those accusations were made in the context of an ongoing

17  police investigation and contributed to arrests and warrants, thereby "intimat[ing] that

18  punishment would imminently follow."  *Ibid*.  (citing *Mendocino Environmental Center v.

19  Mendocino County*, 192 F.3d 1283, 1289-91 (9th Cir. 1999)).

20          District courts applying the above have dismissed allegations similar to those made in the

21  present action.  In *Alderman v. City of Cotati*, for example, the plaintiff alleged that the

22  defendant government officials retaliated against her participation in city council hearings by

23  "paint[ing her] as mentally ill" and calling her "crazy," a "psycho," and "bat shit crazy," both

24  in person and through written communications from municipal email accounts.  *Alderman v.

25  City of Cotati*, No. 19-CV-05844-KAW, 2020 WL 553883, at *1-2 (N.D. Cal. Feb. 4, 2020).

26  Judge Kandis Westmore dismissed plaintiff's claim.  While defendants' behavior was

27  "problematic as a matter of common courtesy" and may have made her feel less welcome at

28  city council hearings, it was not accompanied by an impact to more tangible interests and did

1    not invoke legal sanctions or other means of coercion, persuasion, intimidation, or

2    punishment. *Id.* at 3.

3        Here, plaintiff similarly alleges that defendants, through the disposition report, made

4    defamatory remarks regarding her mental health in retaliation for her filing of a

5    complaint.  There is little doubt that plaintiff's allegations, taken as true, would reflect poorly

6    on defendants and constitute unprofessional and regrettable behavior on the part of public

7    officials.  Nevertheless, in light of the high threshold imposed on retaliation claims based on

8    government speech, plaintiff's allegations do not give rise to a federal claim.  Plaintiff does not

9    allege that any statements or actions by any defendant intimated that any form of punishment,

10   sanction, or adverse action would imminently follow.  Nor does she suggest that defendants'

11   speech had any negative impact on her "rights, benefits, relationship, or status with the

12   state." *Mulligan*, 835 F.3d at 989.

13       Plaintiff does allege that "[w]ithout provocation, Defendants called in a crisis or mental

14   health worker, thereby threatening Plaintiff with a 5150, prior to speaking with her in order to

15   take her report" (Compl. ¶ 26).  "5150" refers to California Welfare and Institutions Code

16   Section 5150, which allows for the involuntary detention of individuals deemed a danger due

17   to mental health disorders.  The use of involuntary detention as a threat would bolster

18   plaintiff's claim.  However, plaintiff's complaint does not allege facts supporting her

19   conclusion that the involvement of a mental health worker intimated that punishment, sanction,

20   or adverse action would imminently follow.  Given the nature of her grievance, a police

21   department would act reasonably in calling in an impartial health expert to assist.  Both sides

22   agree that a social worker was among the group that interviewed plaintiff, and that he handed

23   her a pamphlet outlining available mental health services.  The decision to involve a social

24   worker or similarly trained official in an interaction with an individual whom police suspect

25   (rightly or wrongly) to be experiencing a mental health issue is, standing alone, an entirely

26   appropriate exercise of police discretion.  The complaint also states that "[d]efendants [Morgan

27   and Iwanicki] and Social Worker Tim Henry approached Plaintiff while she was seated in her

28   car, making Plaintiff feel surrounded and intimidating Plaintiff" (Compl. 8).  The act of

United States District Court
Northern District of California

7

1    approaching plaintiff was a reasonable and unavoidable prerequisite to taking her criminal

2    complaint, which she had come to the station to lodge.  Nor does the fact that plaintiff

3    perceived the three to be "white males" suggest the presence of intimidation or threats of

4    sanction (Compl. 2).  No threatening or adverse act or statement is alleged beyond the above,

5    which falls well short of the high bar in our circuit.

6          Plaintiff has voiced her view that HPD officers have long been apathetic to her

7    complaints, that they have denied her redress against bad actors, and that they have, in the most

8    recent instance, retaliated against her in order to dissuade further complaints.  Nevertheless, the

9    appropriate remedy does not lie in the federal courts.  As our court of appeals stated in *Gini*,

10   "[f]or any defamation and damage flowing from it, [plaintiff] has a tort remedy under state

11   law, not under the First Amendment."  40 F.3d at 1045.

12         *Second*, plaintiff's Fourth Amendment claim fails because she does not claim that a

13   search or seizure took place.  *Cnty of Sacramento v. Lewis*, 523 U.S. 833, 833 (1998) ("[The

14   Fourth] Amendment covers only searches and seizures.").

15         *Third*, plaintiff's Fourteenth Amendment equal protection claim fails to allege that

16   defendants acted with intent or purpose to discriminate against the plaintiff based upon

17   membership in a protected class.  *Shavelson v. Hawaii C.R. Comm'n*, 740 F. App'x 532, 534

18   (9th Cir. 2018).  At oral argument, plaintiff offered only that "something felt off" and that no

19   other explanation made sense to her, and pointed to the Supreme Court's decision in *Jackson v.*

20   *Birmingham Board of Education*.  544 U.S. 167 (2005).  Plaintiff's argument on this point

21   misunderstands the law.  Plaintiff reads *Jackson* to hold that if retaliation occurs in response to

22   Jane Doe's attempt to report a grievance tied to her membership in a protected class, then a

23   court may presume that the retaliating party is themselves discriminating against Doe due to

24   her protected identity.  However, *Jackson* concerned the boundaries of Title IX's implied

25   private right of action, and held that "[r]etaliation against a person because that person has

26   complained of sex discrimination is another form of intentional sex discrimination

27   encompassed by Title IX's private cause of action."  *Id*. at 173.  The present action does not

28   bring a Title IX claim, and our court of appeals has never cited *Jackson* outside the Title IX

United States District Court
Northern District of California

8

1    context.  Moreover, even plaintiff's impermissibly broad reading of the *Jackson* holding does

2    not obviate the need to adequately plead retaliation.  As discussed above, plaintiff has

3    not.  *Davis v. Folsom Cordova Unified Sch. Dist.*, 674 F. App'x 699, 702 (9th Cir. 2017) (citing

4    *Jackson* in affirming dismissal of a *Title IX* retaliation claim because plaintiff failed to allege

5    retaliation against him).

6          *Fourth*, plaintiff's due process claim fails because she fails (1) to identify a deprivation of

7    a liberty or property interest protected by the Constitution or a lack of due process (procedural

8    due process), and (2) to plead conduct that shocks the conscience (substantive due

9    process).  *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993) (elements of

10   procedural due process); *Leen v. Thomas*, 708 F. App'x 331, 332 (9th Cir. 2017) (elements of

11   substantive due process).

12         *Fifth*, plaintiff's *Monell* claim must fail because she has not adequately plead that she was

13   deprived of a constitutional right.  *Lockett v. Cnty. of Los Angeles,* 977 F.3d 737, 741 (9th Cir.

14   2020) (elements of *Monell* claim).  Plaintiff's complaint likewise fails to plead facts sufficient

15   to allege that a municipal policy was the moving force behind defendants' actions, whether or

16   not those actions resulted in a constitutional violation.

17         *Sixth*, plaintiff's Section 1985 claim fails to allege the deprivation of a legally protected

18   right on the basis of "invidiously discriminatory class-based animus."  *A & A Concrete, Inc. v.*

19   *White Mountain Apache Tribe*, 676 F.2d 1330, 1333 (9th Cir. 1982).  Again, no deprivation

20   has been plead, and the only allegation of "discriminatory class-based animus" is based on

21   plaintiff's own belief that no other explanation made sense, and a misunderstanding of Title IX

22   case law.

23         *Seventh*, plaintiff's Section 1981 claim fails because "Section 1981 establishes

24   substantive rights that a state actor may violate.  It does not itself contain a remedy against a

25   state actor for such violations.  A plaintiff seeking to enforce rights secured by § 1981 against a

26   state actor must bring a cause of action under § 1983."  *Yoshikawa v. Seguirant*, 74 F.4th 1042,

27   1047 (9th Cir. 2023).  Nor does the substance of plaintiff's complaint make out a claim.  "To

28   state a claim pursuant to section 1981, a plaintiff must allege (1) the plaintiff is a member of a

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1     racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the

2     discrimination concerns one or more of the activities enumerated in the statute." *Keum v.*

3     *Virgin America Inc*., 781 F.Supp.2d 944, 954 (N.D. Cal. 2011) (Judge Illston). The complaint

4     fails to state any facts linking defendants' activity to an intent to discriminate. *See Mesumbe v.*

5     *Howard University*, 706 F.Supp.2d 86, 92 (D.D.C.2010) ("To plead intentional discrimination,

6     plaintiff cannot merely invoke his race in the course of a claim's narrative and automatically be

7     entitled to pursue relief. Rather, plaintiff must allege some facts that demonstrate that race was

8     the reason for defendant's action.").

9        Each of plaintiff's federal claims (claims for relief one through five) are accordingly

10     **DISMISSED.**

11     *Finally*, "[w]here a district court dismisses a federal claim, leaving only state claims for

12     resolution, it should decline jurisdiction over the state claims and dismiss them without

13     prejudice." *Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098, 1101 (9th Cir. 1996); 28 USC §

14     1367(c)(3). Plaintiff's state law claims (claims for relief six to thirteen) are **DISMISSED**.

15

16        **2.**     **PLAINTIFF'S MOTION TO PROCEED UNDER A PSEUDONYM**

17        Plaintiff has filed a separate motion to proceed under a pseudonym (Dkt. No.

18     7). "Plaintiffs' use of fictitious names runs afoul of the public's common law right of access to

19     judicial proceedings and Rule 10(a)'s command that the title of every complaint 'include the

20     names of all the parties." *Does I thru XXIII v. Advanced Textile Corp*., 214 F.3d 1058, 1067

21     (9th Cir. 2000) (internal quotation and citation omitted). Exceptions are made only in "unusual

22     cases." *Ibid*. The record as it stands is insufficient for plaintiff to proceed by pseudonym

23     given the important public right to know who is seeking relief via the federal courts. This

24     order, however, permits plaintiff to proceed via pseudonym for present purposes. If the case is

25     resurrected in some form, the issue will be revisited.

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

Plaintiff's complaint will be **DISMISSED**.  This order follows lengthy oral argument, and the Court is convinced that amendment would be futile.  Dismissal will therefore be with prejudice.

Sadly, the Court received little assistance from counsel concerning the relevant caselaw, and much of the above work was done by the Judge and his staff.  Therefore, this is a **tentative order**, and both sides will have until **MARCH 19 AT NOON** to file a critique of this order and show cause why it should not be entered.  If the Court feels further responsive briefing would be useful, it will so advise.

**IT IS SO ORDERED.**

Dated:  March 5, 2024

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

11