UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JANE DOE,

    Plaintiff,

  v.

CITY OF HAYWARD, et al.,

    Defendants.

No. C 23-05007 WHA

**ORDER RE DEFENDANT'S MOTION TO DISMISS**

## INTRODUCTION

In this civil rights and torts action, defendant police officers, police department, and municipality move to dismiss plaintiff's claims, which stem from a criminal complaint plaintiff filed against unknown third parties, and police defendants' subsequent disposition report and decision not to further investigate. For the reasons stated below, plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE**.

## STATEMENT

Plaintiff, a professor in the Bay Area, describes herself as "a victim of serial crime" (Dkt. No. 20 at 5). Between July 2010 and June 2016, plaintiff submitted seven criminal complaints, while members of her household submitted five more (Dkt. No. 20 Exh. A at 36). Although specific dates and details are not reported in the pleadings, those complaints concerned, among

other crimes: "heavy metal poisoning; a dog attack; tampering with [redacted] car; attempted carjacking/robbery; [and] attempted kidnapping of [redacted] son" (Dkt. No. 20 Exh. B at 43). Many, if not all, of these criminal complaints were submitted to the Hayward Police Department (Compl. 2).

Plaintiff has appended two reports to her opposition. The first, from Bardwell Consulting, concludes that "[plaintiff] and her household has [*sic*] been subjected to a level of crime that cannot be explained by chance" (Dkt. No. 20 Exh. A at 38). The second, attributed to Phyllis Gerstenfeld, concludes that "[plaintiff] was targeted due to her gender," and that the "the technology [used by the perpetrators] implies a sophistication more often seen in organized political schemes than in personal vendettas" (Dkt. No. 20 Exh. B at 45-46). Gerstenfeld concludes that "[plaintiff] has been the victim of hate crimes" and that "domestic terrorism charges could be successfully levied against the person who victimized [plaintiff] and her family" (*ibid*.). A third report, referenced but not on record, is attributed to a Dr. Liu and is said to analyze the origins of the technology used by those victimizing plaintiff.

At issue here is plaintiff's most recent criminal complaint to HPD. On May 27, 2022, plaintiff traveled to a HPD station to file a police report regarding an alleged sexual assault, battery, and hate crime. Plaintiff reported that "a foreign object had been removed from her intimate parts; that she had not consented to this penetration; that her husband was a witness to its location and removal; that an engineering lab had identified the foreign object as an electronic device/semiconductor; that a PhD in electrical engineering . . . Dr. Liu had identified the lab that designed and manufactured this device" (Compl. 8-9).

Plaintiff now claims that police defendants harassed her while she gave her report on May 27, and subsequently retaliated against her for making that report (Compl. 1-2). These allegations fall into three categories: actions taken on May 27, inaccuracies in the resulting report, and subsequent inaction despite plaintiff's repeated follow-up requests.

*First,* on May 27, plaintiff had to wait an hour and a half at the police station before her statement was taken (Compl. 2). Defendants then "caused [plaintiff] to feel surrounded with 3 white males [Officers Daniel Morgan and Alex Iwanicki and social worker Tim Henry]

approaching her in what Plaintiff viewed as some sort of formation as she sat in her car" (*ibid*.) The officers took plaintiff's statement in the parking lot, interviewed her husband, who was nearby, and reviewed the reports provided by plaintiff. Plaintiff then spoke with social worker Henry, who provided her with a pamphlet outlining available mental health services. Plaintiff alleges that these acts were intended to harass her.

*Second*, plaintiff alleges that the resulting police disposition report contained several inaccuracies and falsehoods. For example, the report stated that "[a]ll the reports [plaintiff] downloaded from the Internet could not tell me the simple fact of how these tiny (half-inch resistors) appeared in her vagina. These reports were not useful or relevant." Plaintiff, however, states that these reports evaluated evidence specific to her case and to "her status as a victim of crime" (*id.* at 10). The report stated that Officer Morgan "found no new evidence of a crime" after speaking to plaintiff's husband; plaintiff, however, asserts that her husband provided new evidence of the crime at hand (*ibid*.). The report stated that plaintiff "offered no rational explanation (*i.e.,* recent surgeries, a sexual assault, or suspects) for possible causes," and was only interested in "researching the company who manufactured the electronics to support her conspiracy theory" (*id*. at 11). Plaintiff states that she is in fact in a "systematic investigation . . . NOT only . . . in researching the company who manufactured the electronics," and that she never mentioned any "conspiracy theory" (*id*. at 12). Finally, the report allegedly stated that "the Alameda County Mental Health Clinician listened to [plaintiff] and later made his assessment as delusional behavior, similar to Schizophrenia" (*ibid*.). Plaintiff alleges that this characterization of her mental health is false, and that Alameda County Behavior Services later stated that its clinician (presumably social worker Henry) "never made a negative assessment" about her mental health (*ibid*.).

*Third*, plaintiff alleges that defendants retaliated against her after she submitted her report. Plaintiff sent emails to various defendants on May 27, June 1, June 4, November 27, and December 26 of 2022, as well as January 3 and February 14 of 2023. In these emails, plaintiff asked defendants to make various changes to the May 27 report and to attach her own "expert reports" to that report. Defendants took no action. Plaintiff's November 27

3

communication included a complaint to HPD internal affairs, which was forwarded to the City Attorney's Office.

Plaintiff then filed the present suit, and defendants promptly removed. Defendants now move to dismiss. This order follows full briefing and lengthy oral argument. After oral argument, a tentative order was issued to the parties, and further briefing was invited (Dkt. No. 38). Plaintiff submitted a further brief and supporting declaration (Dkt. Nos. 40, 41). This order carefully considered the arguments made in those supplemental filings and, where necessary, addresses them.

## ANALYSIS

1. **DEFENDANT'S MOTION TO DISMISS.**

In sum, plaintiff has failed to state a federal claim for relief.

*First*, plaintiff fails to claim that her First Amendment right to petition for the redress of a grievance was violated. Our court of appeals has held that the filing of criminal complaints falls within the First Amendment's right to petition. *Entler v. Gregoire,* 872 F.3d 1031, 1043 (9th Cir. 2017). Plaintiff was allowed to exercise that right on May 27. Defendants interviewed plaintiff and her husband, reviewed her proffered expert reports, and issued a disposition report. That is all the right to petition promises. Plaintiff does not have a right to any particular investigation or prosecution. *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015) ("[Plaintiff] does not have a constitutional right to have the police investigate his case at all, still less to do so to his level of satisfaction."). Plaintiff's later petitions were also heard. Plaintiff's November 27 complaint to HPD internal affairs was promptly forwarded to the City Attorney's Office, which investigated and determined it to be unfounded. Plaintiff's complaint to Alameda County Behavioral Health Care Services was also investigated: plaintiff was interviewed by Chief Compliance Officer Dr. Ravi Mehta, who reviewed plaintiff's claims with a crisis team and reached the conclusion that his staff followed proper procedures and did not engage in wrongdoing (Dkt. No. 20 Exh. C).

4

Plaintiff's right to petition includes the right to do so without retaliation:

> "The First Amendment forbids government officials from retaliating against individuals for speaking out. To recover under § 1983 for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action."

*Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citations omitted). As noted above, defendants' actions on May 27 and after were entirely unremarkable and fail the second prong above.

However, plaintiff's allegation that defendants' disposition report made false statements attacking plaintiff's mental health and credibility in order to dissuade further complaints merits discussion (Compl. ¶ 35). First Amendment retaliation claims generally concern "exercises of governmental power that are regulatory, proscriptive, or compulsory in nature and have the effect of punishing someone for his or her speech." *Mulligan v. Nichols*, 835 F.3d 983, 988 (9th Cir. 2016) (cleaned up). Here, plaintiff instead alleges that defendants chilled her right to petition through speech of their own (*i.e.,* the statements within the disposition report).

The bar for retaliation claims grounded in government speech is a high one. As our court of appeals explained in *Mulligan*:

> Retaliation claims involving government speech warrant a cautious approach by courts. Restricting the ability of government decisionmakers to engage in speech risks interfering with their ability to effectively perform their duties. It also ignores the competing First Amendment rights of the officials themselves. The First Amendment is intended to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail. That marketplace of ideas is undermined if public officials are prevented from responding to speech of citizens with speech of their own. In accordance with these principles, we have set a high bar when analyzing whether speech by government officials is sufficiently adverse to give rise to a First Amendment retaliation claim.

*Id*. at 989 (cleaned up).

It is beyond cavil "that damage to reputation is not actionable under § 1983 unless it is accompanied by some more tangible interests." *Patton v. Cnty. of Kings*, 857 F.2d 1379, 1381

5

(9th Cir. 1988). Our court of appeals held in *Gini v. Las Vegas Metropolitan Police Department* that this basic limitation on Section 1983 "cannot be avoided by alleging that defamation by a public official occurred in retaliation for the exercise of a First Amendment right." 40 F.3d 1041, 1045 (9th Cir. 1994). There, the plaintiff alleged that the defendant police officers retaliated against her filing of an internal affairs complaint by making defamatory statements about her to her employer (a federal judge), thereby causing her to be terminated. *Id*. at 1043-44. Our court of appeals affirmed the dismissal of her retaliation claim against the city, holding that defamation by government officials does not establish a First Amendment claim in the absence of "state action affecting [plaintiff's] rights, benefits, relationship or status with the state." *Id*. at 1045; *see Nunez v. City of Los Angeles*, 147 F.3d 867, 875-76 (9th Cir. 1998) (holding that allegations of "mere threats and harsh words" did not suffice to state a First Amendment employment claim against defendant government employer absent "the loss of a valuable governmental benefit or privilege") (internal quotation omitted). *Mulligan* confirmed once more that a First Amendment retaliation claim based on government speech must be accompanied by a "decision or . . . state action affecting [plaintiff's] rights, benefits, relationship or status with the state" or a "threat of invoking legal sanctions [or] other means of coercion, persuasion, and intimidation." 835 F.3d at 989, n. 5 (internal quotations omitted). In *Mendocino Environmental Center v. Mendocino County*, for example, evidence that police officers made false accusations of criminal activity against plaintiffs established a First Amendment claim because those accusations were made in the context of an ongoing police investigation and contributed to arrests and warrants, thereby "intimat[ing] that punishment would imminently follow." *Ibid*. (citing *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1289-91 (9th Cir. 1999)).

District courts applying the above have dismissed allegations similar to those made in the present action. In *Alderman v. City of Cotati*, for example, the plaintiff alleged that the defendant government officials retaliated against her participation in city council hearings by "paint[ing her] as mentally ill" and calling her "crazy," a "psycho," and "bat shit crazy," both in person and through written communications from municipal email accounts. *Alderman v.*

*City of Cotati*, No. 19-CV-05844-KAW, 2020 WL 553883, at *1-2 (N.D. Cal. Feb. 4, 2020). Judge Kandis Westmore dismissed plaintiff's claim. While defendants' behavior was "problematic as a matter of common courtesy" and may have made her feel less welcome at city council hearings, it was not accompanied by an impact to more tangible interests and did not invoke legal sanctions or other means of coercion, persuasion, intimidation, or punishment. *Id.* at 3.

Here, plaintiff similarly alleges that defendants, through the disposition report, made defamatory remarks regarding her mental health in retaliation for her filing of a complaint. There is little doubt that plaintiff's allegations, taken as true, would reflect poorly on defendants and constitute unprofessional and regrettable behavior on the part of public officials. Nevertheless, in light of the high threshold imposed on retaliation claims based on government speech, plaintiff's allegations do not give rise to a federal claim. Plaintiff does not allege that any statements or actions by any defendant intimated that any form of punishment, sanction, or adverse action would imminently follow. Nor does she suggest that defendants' speech had any negative impact on her "rights, benefits, relationship, or status with the state." *Mulligan*, 835 F.3d at 989.

Plaintiff does allege that "[w]ithout provocation, Defendants called in a crisis or mental health worker, thereby threatening Plaintiff with a 5150, prior to speaking with her in order to take her report" (Compl. ¶ 26). "5150" refers to California Welfare and Institutions Code Section 5150, which allows for the involuntary detention of individuals deemed a danger due to mental health disorders. The use of involuntary detention as a threat would bolster plaintiff's claim. However, plaintiff's complaint does not allege facts supporting her conclusion that the involvement of a mental health worker intimated that punishment, sanction, or adverse action would imminently follow. Given the nature of her grievance, a police department would act reasonably in calling in an impartial health expert to assist. Both sides agree that a social worker was among the group that interviewed plaintiff, and that he handed her a pamphlet outlining available mental health services. The decision to involve a social worker or similarly trained official in an interaction with an individual whom police suspect

7

1   (rightly or wrongly) to be experiencing a mental health issue is, standing alone, an entirely
2   appropriate exercise of police discretion.  Plaintiff, in her supplemental briefing, argues that the
3   presence of a social worker was retaliatory because officers engaged the social worker before
4   speaking with her, and therefore could not have suspected that a mental health issue exists
5   (Dkt. No. 40 at 5).  True.  However, plaintiff and HPD share a lengthy history (*id*. at 9).  It is
6   reasonable to draw on past encounters with an individual when determining the necessity of a
7   social worker.  Moreover, even if officers had *no* prior information regarding plaintiff or her
8   claims, the argument that the mere presence of a social worker evidences retaliation,
9   intimidation, or other bad acts on the part of the police simply fails.

10   The complaint also states that "[d]efendants [Morgan and Iwanicki] and Social Worker
11   Tim Henry approached Plaintiff while she was seated in her car, making Plaintiff feel
12   surrounded and intimidating Plaintiff" (Compl. 8).  The act of approaching plaintiff was a
13   reasonable and unavoidable prerequisite to taking her criminal complaint, which she had come
14   to the station to lodge.  Nor does the fact that plaintiff perceived the three to be "white males"
15   suggest the presence of intimidation or threats of sanction (Compl. 2).  No threatening or
16   adverse act or statement is alleged beyond the above, which falls well short of the high bar in
17   our circuit.

18   Finally, plaintiff's supplemental briefing fleshes out a theory of retaliatory investigation,
19   citing *White v. Lee* (Dkt. No. 40 at 2-8).  227 F.3d 1214 (9th Cir. 2000).  In *White*, which came
20   up on appeal of summary judgment, defendant HUD officials explicitly told plaintiffs that they
21   had violated the Fair Housing Act by engaging in speech critical of HUD activities, directed
22   plaintiffs to produce their publications and personal contact information under threat of
23   subpoena, interrogated plaintiffs under threat of subpoena, explicitly asserted HUD's purported
24   authority to investigate "speech advocating illegal acts," and told a major newspaper that
25   plaintiffs had "broken the law."  *White*, 227 F.3d at 1228-29.  Those actions constituted a
26   "threat of invoking legal sanctions [or] other means of coercion, persuasion, and intimidation."
27   *Mulligan*, 835 F.3d at 989, n. 5.  Here, in stark contrast, plaintiff alleges a retaliatory
28   investigation on the basis of (1) the presence of a social worker during the taking of her

8

complaint; (2) the use of a "disposition report" for her complaint, "which on information and belief, the CA Department of Justice collects once a case involving a suspect is resolved," (3) that officers identified her call as "call type: 415C," which, "[a]s plaintiff understands it . . . is Hayward police code for child harassment," and (4) that "[p]laintiff noted concentrated surveillance at her residence,"  (Dkt. No. 40 at 2-3).  The first three facts do not cut a figure. While plaintiff is correct that all reasonable inferences must be drawn in her favor, those inferences must be *reasonable*.  The allegation of concentrated surveillance is more serious and should be further explained in any motion to amend that plaintiff may file.  As it stands, however, it is not enough.  The allegations made in plaintiff's supplemental briefing do not give rise to a reasonably inference that defendants intended to or did in fact threaten plaintiff with legal sanction or other means of coercion, persuasion, and intimidation.  To so hold would render much of everyday policing a threat.

Plaintiff has voiced her view that HPD officers have long been apathetic to her complaints, that they have denied her redress against bad actors, and that they have, in the most recent instance, retaliated against her in order to dissuade further complaints.  Nevertheless, the appropriate remedy does not lie in the federal courts.  As our court of appeals stated in *Gini*, "[f]or any defamation and damage flowing from it, [plaintiff] has a tort remedy under state law, not under the First Amendment."  40 F.3d at 1045.

*Second*, plaintiff's Fourth Amendment claim fails because she does not claim that a search or seizure took place.  *Cnty of Sacramento v. Lewis*, 523 U.S. 833, 833 (1998) ("[The Fourth] Amendment covers only searches and seizures.").

*Third*, plaintiff's Fourteenth Amendment equal protection claim fails to allege that defendants acted with intent or purpose to discriminate against the plaintiff based upon membership in a protected class.  *Shavelson v. Hawaii C.R. Comm'n*, 740 F. App'x 532, 534 (9th Cir. 2018).  At oral argument, plaintiff offered only that "something felt off" and that no other explanation made sense to her, and pointed to the Supreme Court's decision in *Jackson v. Birmingham Board of Education*.  544 U.S. 167 (2005).  Plaintiff's argument on this point misunderstands the law.  Plaintiff reads *Jackson* to hold that if retaliation occurs in response to

9

Jane Doe's attempt to report a grievance tied to her membership in a protected class, then a court may presume that the retaliating party is themselves discriminating against Doe due to her protected identity. However, *Jackson* concerned the boundaries of Title IX's implied private right of action, and held that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Id*. at 173. The present action does not bring a Title IX claim, and our court of appeals has never cited *Jackson* outside the Title IX context. Moreover, even plaintiff's impermissibly broad reading of the *Jackson* holding does not obviate the need to adequately plead retaliation. As discussed above, plaintiff has not. *Davis v. Folsom Cordova Unified Sch. Dist.*, 674 F. App'x 699, 702 (9th Cir. 2017) (citing *Jackson* in affirming dismissal of a *Title IX* retaliation claim because plaintiff failed to allege retaliation against him).

*Fourth*, plaintiff's due process claim fails because she fails (1) to identify a deprivation of a liberty or property interest protected by the Constitution or a lack of due process (procedural due process), and (2) to plead conduct that shocks the conscience (substantive due process). *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993) (elements of procedural due process); *Leen v. Thomas*, 708 F. App'x 331, 332 (9th Cir. 2017) (elements of substantive due process).

*Fifth*, plaintiff's *Monell* claim must fail because she has not adequately pled that she was deprived of a constitutional right. *Lockett v. Cnty. of Los Angeles,* 977 F.3d 737, 741 (9th Cir. 2020) (elements of *Monell* claim). Plaintiff's complaint likewise does not plead facts sufficient to allege that a municipal policy was the moving force behind defendants' actions, whether or not those actions resulted in a constitutional violation.

*Sixth*, plaintiff's Section 1985 claim fails to allege the deprivation of a legally protected right on the basis of "invidiously discriminatory class-based animus." *A & A Concrete, Inc. v. White Mountain Apache Tribe*, 676 F.2d 1330, 1333 (9th Cir. 1982). Again, no deprivation has been plead, and the only allegation of "discriminatory class-based animus" is based on

plaintiff's own belief that no other explanation made sense, and a misunderstanding of Title IX case law.

*Seventh*, plaintiff's Section 1981 claim fails because "Section 1981 establishes substantive rights that a state actor may violate. It does not itself contain a remedy against a state actor for such violations. A plaintiff seeking to enforce rights secured by § 1981 against a state actor must bring a cause of action under § 1983." *Yoshikawa v. Seguirant*, 74 F.4th 1042, 1047 (9th Cir. 2023). Nor does the substance of plaintiff's complaint make out a claim. "To state a claim pursuant to section 1981, a plaintiff must allege (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerns one or more of the activities enumerated in the statute." *Keum v. Virgin America Inc.*, 781 F.Supp.2d 944, 954 (N.D. Cal. 2011) (Judge Illston). The complaint fails to state any facts linking defendants' activity to an intent to discriminate. *See Mesumbe v. Howard University*, 706 F.Supp.2d 86, 92 (D.D.C.2010) ("To plead intentional discrimination, plaintiff cannot merely invoke his race in the course of a claim's narrative and automatically be entitled to pursue relief. Rather, plaintiff must allege some facts that demonstrate that race was the reason for defendant's action.").

Each of plaintiff's federal claims (claims for relief one through five) are accordingly **DISMISSED.**

*Finally*, "[w]here a district court dismisses a federal claim, leaving only state claims for resolution, it should decline jurisdiction over the state claims and dismiss them without prejudice." *Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098, 1101 (9th Cir. 1996); 28 USC § 1367(c)(3). Plaintiff's state law claims (claims for relief six to thirteen) are **DISMISSED**.

### 2. PLAINTIFF'S MOTION TO PROCEED UNDER A PSEUDONYM

Plaintiff has filed a separate motion to proceed under a pseudonym (Dkt. No. 7). "Plaintiffs' use of fictitious names runs afoul of the public's common law right of access to judicial proceedings and Rule 10(a)'s command that the title of every complaint 'include the names of all the parties." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000) (internal quotation and citation omitted). Exceptions are made only in "unusual

11

cases." *Ibid*. The record as it stands is insufficient for plaintiff to proceed by pseudonym given the important public right to know who is seeking relief via the federal courts. This order, however, permits plaintiff to proceed via pseudonym for present purposes. If the case is resurrected in some form, the issue will be revisited.

## CONCLUSION

Plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE**. Plaintiff may seek leave to amend her complaint by motion, noticed on a normal thirty-five-day calendar, by **MAY 10, 2024, AT NOON**. Note, plaintiff must seek leave to amend prior to filing an amended complaint; her request to file an amended complaint, made at the conclusion of her supplemental briefing, is not yet granted because of its brevity and significant doubts regarding the efficacy of any amendment. Plaintiff is advised that she may appeal this matter to the Court of Appeals for the Ninth Circuit within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(1)(A).

**IT IS SO ORDERED.**

Dated: April 18, 2024

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE